212 So.2d 705 (1968)
Howard E. STUMPF
v.
METAIRIE MOTOR SALES, INC.
No. 3161.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1968.
*706 Price & Francipane, Chester Francipane, Metairie, for plaintiff-appellee.
Phelps, Dunbar, Marks, Claverie & Sims, Edward J. Gay, III, New Orleans, for defendant-appellant.
Chaffe, McCall, Phillips, Burke, Toler & Sarpy, Peter A. Feringa, Jr., New Orleans, for Ford Motor Company, third-party defendant and appellant.
Before YARRUT, CHASEZ and BARNETTE, JJ.
BARNETTE, Judge.
This is an action in redhibition wherein the plaintiff seeks the rescission of sale of a new Ford automobile purchased from defendant, and the return of the purchase price. From a judgment for plaintiff, Howard E. Stumpf, substantially as prayed, the defendant, Metairie Motor Sales, Inc., has appealed. The third party petition of Metairie against Ford Motor Company was dismissed "without prejudice." The third party defendant, Ford Motor Company, has appealed only insofar as the dismissal is "without prejudice," seeking an amendment to make the dismissal of the action against it "with prejudice."
On the evening of October 3, 1966, plaintiff and his teen-age son went to defendant's place of business to purchase a new car primarily for the son's use. Mr. and Mrs. Stumpf had expressed some anxiety about the safety of the compact car which the son was using, and desired a more conventional car. The son selected an "apple red" convertible Ford Fairlane. Mr. Stumpf was not entirely pleased with the selection of a convertible because of the safety factor. Nevertheless he agreed to purchase it.
An agreement was reached on the trade-in allowance on the son's old car, and Mr. Stumpf gave, in addition to this allowance, a check for $200. A purchase order was prepared and signed that evening (October 3) by Mr. Stumpf. It called for the installation of certain special features, including power brakes. This required a few days to make the car ready for delivery. A "Check List" describing the automobile was signed by Mr. Stumpf on October 6, and the car was delivered to plaintiff on October 7.
On October 8, plaintiff attempted to take the car for a personal trial but the engine went dead as he was backing out of his driveway. He got it started again and put it back into the carport without driving it off his premises. On the same day the car was taken by Mrs. Stumpf and her son to defendant's shop for some minor adjustments not related to the engine-stopping episode.
Sometime between October 8 and 17, the car was returned to defendant's shop for an adjustment relative to the engine "going dead." No repair order was made out, but the evidence is clear that, on this occasion, the shop foreman or supervisor made an adjustment to the "idle" set.
On October 17, the car was returned to defendant's shop for further minor adjustments, including window alignment, top folding mechanism adjustments and the repair of the license plate light. A complaint was then made that the engine was not responding properly to acceleration and that the motor would cut out. An adjustment allegedly was made to the carburetor and timing points, and the car was delivered that day. According to plaintiff's testimony the engine continued to perform improperly on acceleration and would cut out and go dead, which allegedly continued *707 until the car was returned to defendant's shop on October 24. During this period from October 17 to 24 the car was driven 281 miles.
On October 24 the car would not start and plaintiff, admittedly quite irritated, phoned defendant to come get the car. The car was towed to defendant's shop by wrecker. Further adjustments were made and, according to defendant's witnesses, the trouble was corrected, and the car was returned to plaintiff's residence. Upon being told that the car had been returned, plaintiff went home to try out the car and was dissatisfied with its performance and again returned it to defendant's shop. Mr. Charles Stuart, defendant's service manager, personally tested the car in the presence of Mr. and Mrs. Stumpf and found that it did "hesitate or stumble" on acceleration on some occasions. He described it as being "inconsistent". He asked that they leave the car for a thorough examination and testing.
The automobile remained in defendant's shop from October 24 to October 28. During this time the carburetor was completely disassembled and examined part by part; the electrical system and all component parts relating to engine performance were checked and road tested. During the period all other items about which complaints had been made were corrected. These related to such things as a relatively minor paint defect, weather stripping over a door, and top alignment. The car was then again delivered to plaintiff and it was placed in his carport.
During this period, October 24 to 28, plaintiff consulted an attorney and, acting upon his advice, he left the car in the carport where it remained unused to the date of trial, except for the occasions when it was tested as indicated below.
On November 4, plaintiff's attorney wrote to defendant asserting that the car was "not suitable as new merchandise" and was still in need of repair. A rescission of the sale was demanded. The defendant replied to this letter on November 14, indicating its desire to meet with plaintiff and discuss the problems he was having with the car. On November 18, plaintiff's attorney wrote notifying defendant of his intention to file suit for rescission and concluded: "We herewith tender the return of the automobile and you may pick it up at your convenience from Mr. Stumpf's residence." On November 19 defendant wrote to plaintiff's attorney, with a copy to plaintiff, asserting in substance that defendant's obligations were limited by the terms of the Ford warranty as stated in the manual given to Mr. Stumpf at the time of purchase and acceptance of the car. Defendant declared its willingness to meet its obligation under that warranty. This suit, filed December 5, 1966, followed.
Sometime in November, the exact date not being known, plaintiff asked a friend, B. J. Mayer, to test the car. Mr. Mayer was identified as a service manager for another automobile agency and qualified as an expert in automobile mechanics. He and Mr. Stumpf each drove the car a short distance, at most a few blocks, during which time he testified that the car did not perform properly. He described it as having "no pick-up whatsoever," and that it was dangerous crossing intersections because of this. He thought this might have been due to a butterfly valve not opening fully, which called for a minor adjustment, but that he made no attempt to do so. He also described a cutting out and backfiring at 50 miles per hour. He said: "It wants to die and pick up again." All of this testimony related to the first time he drove the car in November, 1966. He testified that he drove the car again about a week before trial, after the Ford expert had examined it, which will be discussed below. Mr. Mayer described its performance on this occasion as being the same as the first time he drove it, and said that he could keep it going only by maintaining one foot on the accelerator and one on the brake. As an expert he discussed the many things which could cause or contribute to a motor malfunction *708 such as he described but made no attempt to specify the cause in this instance.
A few days before trial of the case after the automobile had been idle in plaintiff's carport for approximately 11 months, unused except for the one occasion when it was examined by Mr. Mayer in November, 1966, it was towed to defendant's shop for examination by a Ford Motor Company expert. The battery was first charged and then the motor started without difficulty. Mr. Mayer was there and attested to this. The car was then road tested by A. D. Smith, the Ford Motor Company expert. He was accompanied by the attorneys for plaintiff, defendant and Ford Motor Company, respectively. The car was driven at various speeds up to 75 miles per hour without incident on the I10 Expressway. When they were required to stop for a traffic light at Canal Boulevard, the engine went dead and could not be started again until Mr. Smith shook or struck the carburetor. On the return to defendant's shop it was necessary to slow down for a school bus and the engine went dead again. It would not start until Mr. Smith again shook or struck the carburetor.
Mr. Smith testified that the trouble was caused by a sticking needle valve and gave lengthy expert testimony of the probability of oxidation having taken place in the fuel system due to nonuse for 11 months, causing some obstruction. He also theorized that the needle valve was not properly lubricated because of nonuse over a long time.
It was after this date that Mr. Mayer drove the car the second time about which he testified as we have stated above.
Counsel for defendant has argued strenuously that the automobile was not defective; that the malfunction complained of resulted from causes which could have been remedied by minor repairs, such as adjustment of the needle valve, etc. He also placed a great deal of stress on the theory of possible corrosion in the fuel system due to nonuse for several months about which Mr. Smith testified. This theory we must discount in view of testimony that new automobiles often sit idle for months awaiting sale and delivery without such trouble resulting. Furthermore Mr. Smith's idea as to the cause of the malfunction is no more than an unproven theory or expert opinion. There had been previous expert opinions and theories by defendant's employees, such as a ball valve in the carburetor not seating properly, but correction of these alleged defects did not remedy the trouble.
The Civil Code of Louisiana imposes upon the seller of things certain specific obligations and one of these is warranty of the thing sold against redhibitory vices. LSA-C.C. art. 2476. The pertinent articles relative to the vices which give rise to the redhibitory action are LSA-C.C. arts. 2520 and 2530. LSA-C.C. art. 2520 provides:

"Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice."
LSA-C.C. art. 2530 reads:
"The buyer who institutes the redhibitory action, must prove that the vice existed before the sale was made to him. If the vice has made its appearance within three days immediately following the sale, it is presumed to have existed before the sale."
There is ample authority in our jurisprudence for the application of these codal provisions to the sale of automobiles. The question then is simply one of fact whether the imperfections in the automobile rendered its use so inconvenient that the plaintiff would not have bought it if he had known of them.
This is the question posed by the Court in Reech v. Coco, 223 La. 346, 65 So.2d 790. There the facts were more convincing than *709 those in this case, but the principle stated by the Court in the following language is equally applicable here:
"* * * It is manifest that, aside from any express warranty, a purchaser of an automobile is entitled to a vehicle that will meet his needs and that a car which will not run or runs intermittently or imperfectly and which requires the frequent attention of a mechanic to keep it going is an abomination to the owner." 65 So.2d at 792-793.
In Glenn v. Caire, 164 So.2d 656 (La.App.3d Cir.1964), the court gave a very good statement of the jurisprudence on this subject in the following language:
"It is settled that in an action to set aside a sale on a plea of redhibition where complicated machinery is involved, it is not necessary for the buyer to seek out and prove the particular and underlying cause of the defect which makes the object sold unfit for its intended use. It is sufficient that he allege and prove that such a defect exists. Fisher v. City Sales and Service, supra [La.App., 128 So.2d 790]; Crawford v. Abbott Automobile Co., supra [157 La. 59, 101 So. 871]; Brown-Roberts Hardware & Supply Co. v. Evans, La.App. 2 Cir., 153 So. 562; Goff v. Dewey Olivier, Inc., La.App. 3 Cir., 137 So.2d 393 (Cert. denied); J. B. Beaird Co. v. Burris Bros., supra [216 La. 655, 44 So.2d 693]; Charles A. Kaufman Co. v. Gillman, La.App.Orl., 142 So. 159; and Bergeron v. Mid-City Motors, Inc., La.App. 1 Cir., 162 So.2d 835.
"In Fisher v. City Sales and Service, supra, we said:
"Although the plaintiff has not proven exactly what defect of the machine caused the fuses to blow so often, we think that, by itself, the repeated burning of the fuses causing repeated interruption of the service of the unit, is a defect of a redhibitory nature entitling the plaintiff to rescission of the sale, if indeed caused by or resulting from the normal use of the machine, as we think the plaintiff has sufficiently proved; * * *.' (128 So.2d 792).
"Also in Crawford v. Abbott Automobile Co., supra, our Supreme Court held:
`"It is not incumbent upon the buyer to seek out, allege and prove the particular and underlying cause of the defects which make the thing sold unfit for the purpose intended, particularly when the thing is a complicated piece of machinery; but it suffices if he alleges and afterwards proves as a fact that such defects exist."' (101 So. 872)." 164 So.2d at 659-660.
See also Ditta v. Polk Chevrolet, Inc., 196 So.2d 672 (La.App.1st Cir.1967).
Applying the foregoing principles to the factual situation, which we have carefully related above, we must conclude that the plaintiff is entitled to a rescission of the sale.
We have given serious consideration to the fact that after October 28, 1966, the plaintiff gave the defendant no real opportunity to make further attempts to correct the defect in the automobile. However the car was tendered and the defendant was not prevented by any act of plaintiff from on its own making further attempts to find and correct the cause of its continued malfunction. Had defendant done so, it might have established conclusively that there was no serious imperfection but merely a need of minor adjustment, as it now contends, and thus have put itself in a more defensible position to an action in redhibition. As of the date of the trial below the automobile was still imperfect and its imperfection was so serious as to render it of no practical value to the purchaser. Unquestionably it was not suitable for its intended purpose. It is of no consequence that the cause of the difficulty might ultimately have been determined to be minor and repairable at nominal *710 cost. If the engine would not run properly, for whatever cause, it was just as annoying and useless to plaintiff. We must reject defendant's argument that the automobile was not "defective."
LSA-C.C. art. 2530 establishes a presumption that the vice in the thing existed before the sale if it becomes manifest within three days. This does not preclude proof, however, that the vice did in fact exist before the sale. There is some evidence that the defect did make its appearance within three days, but this is of little importance since the plaintiff has borne the burden of proof required by this article.
The defendant seeks to avoid its liability on the basis of a waiver of warranty contained in the "Retail Buyers Order" and a "Check List," both of which were signed by plaintiff.
The "Retail Buyers Order" signed by Mr. Stumpf on the evening of October 3 contained in the fine print of the prepared form the following:
"It is agreed and understood that no warranties of any kind or character, either expressed, implied, are made by you of and concerning the car to be delivered to me, other than the manufacturer's warranties."
The "Check List" contains a block with the word "SERVICED" under which is the following statement:
"I Have Checked This Automobile and Have Found It To Be In Satisfactory Condition Except For The Items Mentioned In The Remarks Section Below.
"I Further Understand That Metairie Ford Will Make All Future Adjustments Under The Terms of The Regular FORD MOTOR CO. WARRANTY ONLY!
 [Signed] H. E. Stumpf
 Customer"
This was signed by Mr. Stumpf on October 6. The Ford Motor Company warranty to which the above references are made is contained in an owner's manual which was not delivered to plaintiff until some days later after the purchase was complete.
An exclusion or waiver of warranty by which parties take themselves out of the coverage of specific or general law and make a law unto themselves must be strictly construed. Harris v. Automatic Enterprises of Louisiana, Inc., 145 So.2d 335 (La.App.4th Cir. 1962). The Civil Code of Louisiana makes specific provision for the protection of buyers from vices and defects in things sold. These, we call redhibitory vices. The clear intent of the codal articles is that buyers have a right to assume that a thing, such as an automobile, is suitable for the purpose intended and they may safely rely upon this implied representation. To constitute a valid waiver of this protection of the codal law of this State, the waiver must be specific and unequivocal. The alleged waiver of warranty relied upon by defendant falls short of meeting this requirement and will not preclude plaintiff's right to an action in redhibition.
In its brief the defendant has brought to our attention the following:
"In calculating the amount of the judgment against Metairie, the Court has included the down payment ($200.00), plus the trade in allowance ($357.95), plus the face value of the note signed by plaintiff ($3,735.72).
"Included in the note signed by plaintiff was the sum of $112.07 for credit life insurance. The record does not show that credit life insurance was required by Metairie, therefore it is not a necessary expense of the sale and cannot be recovered."
We must concede that this point is well taken and the judgment will be amended accordingly. LSA-C.C. art. 2531.
*711 Defendant also contends:
"Further, plaintiff is clearly entitled to a refund credit upon satisfaction of the note before maturity. It is submitted that the amount of this refund must be deducted from the amount of the judgment, for a holding to the contrary would allow plaintiff to profit at the expense of defendant in a situation in which it is clearly the intention of the law to restore the parties as closely as possible to their positions prior to the sale."
This contention also has merit. Accordingly the judgment will be amended so as to provide that plaintiff have judgment for $557.95, representing the cash and trade-in allowance and judgment ordering defendant to return plaintiff's installment note in the principal sum of $3,735.72 given for the credit portion of the sale price, subject to credit to defendant of $112.07, representing the credit life insurance premium included in the face amount of said note, or in default of return of said note, the plaintiff is entitled to judgment in the additional sum of $3,623.65, or the total sum of $4,181.60.
The appeal of the third party defendant, Ford Motor Company, is directed chiefly to the judgment which dismissed the third party petition "without prejudice." The reasons given by the trial judge were:
"The third-party demand of Metairie Ford against the manufacturer involves contractual rights between the parties and will be dismissed without prejudice."
We concur in the reasons given and see no basis for disturbing the judgment in this respect.
For the foregoing reasons the judgment in favor of plaintiff, Howard E. Stumpf, against the defendant, Metairie Motor Sales, Inc., insofar as same awards plaintiff the sum of $4,293.97, is amended to read as follows:
It is further ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Howard E. Stumpf, against defendant, Metairie Motor Sales, Inc., predicated upon the return of the subject automobile to defendant, in the full sum of $557.95 with legal interest thereon from judicial demand and it is further ordered, adjudged and decreed that defendant, Metairie Motor Sales, Inc., return to plaintiff, Howard E. Stumpf, that certain installment note in the principal sum of $3,735.72 given for the credit portion of the purchase price of the said described automobile, subject to a credit in favor of defendant of $112.07, or in default thereof, there be additional judgment in favor of plaintiff against the defendant in the sum of $3,623.65 making the total judgment, in that event, the sum of $4,181.60 with legal interest thereon from date of judicial demand and all costs of court.
As amended and in all other respects the judgment is affirmed at appellant's cost.
Amended and affirmed.