226 So.2d 198 (1969)
Raymond GAUCHE
v.
FORD MOTOR COMPANY et al.
No. 3472.
Court of Appeal of Louisiana, Fourth Circuit.
May 5, 1969.
On Rehearing July 31, 1969.
*200 Gauche, Wegener & Oster, Robert J. Oster, New Orleans, for plaintiff-appellant.
Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, David L. Campbell and John William Futrell, New Orleans, for Ford Motor Co., defendant-appellee.
Clay, Coleman, Dutrey & Thomson, Louis J. Dutrey, and Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Frank C. Allen, Jr., New Orleans, for Clay-Dutton, Inc., defendant-appellee.
Before SAMUEL, BARNETTE and GARDINER, JJ.
BARNETTE, Judge.
This suit was instituted by plaintiff, Raymond Gauche, purchaser of a 1965 Lincoln Continental automobile, against the vendor, Clay-Dutton, Inc., seeking a rescission of the sale and damages because of alleged redhibitory vices and defects in the braking system of the automobile. Plaintiff also joined as a defendant the manufacturer of the automobile, Ford Motor Company, alleging breach of warranty. General denials were filed by both parties with affirmative allegations that if plaintiff experienced any difficulty with the brakes it was the result of "negligence" of the driver of the vehicle, plaintiff's wife, from the abusive manner in which she drove the car. This alleged "negligence" was specifically pleaded as a bar to recovery.
The defendant Clay-Dutton filed a third-party demand against Ford Motor Company and its insurer, Insurance Company of North America, seeking indemnification from Ford as manufacturer of the automobile for any amount for which it might be cast to plaintiff. It pleaded the doctrine of res ipsa loquitur and warranty against hidden defects. Judgment was rendered in favor of defendants, without written reasons, rejecting plaintiff's demands and in favor of the third-party defendants rejecting the demands of the third-party plaintiff. The plaintiff has appealed. Clay-Dutton, third-party plaintiff against *201 Ford Motor Company and Insurance Company of North America, did not appeal the judgment rejecting its third-party petition.
The record reveals that plaintiff purchased a new 1965 Lincoln Continental automobile from defendant Clay-Dutton, Inc., in January 1965 for $7,412.25, of which $5,800 was paid in cash and the balance of $1,612.75 was paid by a trade-in of plaintiff's 1960 model Lincoln. He received delivery on February 1, 1965. The automobile was driven exclusively by plaintiff's wife, Mrs. Julia M. Gauche; Mr. Gauche does not drive an automobile. It had been driven only 491 miles by April 5, 1965, the date of the first incident of brake failure.
On the morning of April 5, 1965, plaintiff and his wife were returning to their home in New Orleans from a trip to Pascagoula, Mississippi. Upon reaching the crest of the Elysian Fields Avenue overpass in the City of New Orleans, and while driving at the rate of 30 to 35 miles per hour, the power brakes of the Lincoln failed when Mrs. Gauche attempted to check the speed of the automobile down the incline of the overpass. From the momentum of the vehicle and the additional velocity gained by the descent of the overpass, the car travelled through eight street intersections. It was losing momentum but Mrs. Gauche was unable to stop it. In an effort to avoid a possible more serious accident, Mrs. Gauche ran into the rear end of a parked New Orleans Public Service bus, causing slight damage to both vehicles.
The police officer investigating the accident tested the brakes of the car and found they would stop the vehicle at slow speeds although the pedal went to the floor. On his instructions the car was towed to the City Pound for a brake inspection by Warren Labiche, brake inspector for the New Orleans Police Department, who concluded the brakes were not functioning properly. The automobile was then returned to Clay-Dutton for repair of the damages resulting from the accident and for a brake inspection. It was Clay-Dutton's conclusions that the brakes were functioning properly, but at plaintiff's insistence that the brakes be replaced, Clay-Dutton installed new brake rotors and pads in the front wheel brake units.
On July 3, 1965, plaintiff and his wife left their home near the intersection of Carrollton and Claiborne Avenues for the Vista Shores Club of New Orleans on St. Bernard Avenue, a distance of some five or six miles. As Mrs. Gauche was attempting a turn from Robert E. Lee Boulevard onto St. Bernard Avenue, the brakes failed again. On this brakeless trip, the Lincoln ran on its own momentum down Robert E. Lee Boulevard until Mrs. Gauche made a "U" turn across the neutral ground separating the lanes of traffic, sending the automobile back in the opposite direction, then onto St. Bernard Avenue until finally, through loss of momentum, it came to rest approximately one-half block from the entrance to Vista Shores Club.
Plaintiff, by letter to both defendants, dated July 14, 1965, made a demand for rescission of the sale, for the return of the $5,800 paid to defendant Clay-Dutton, and for the return of the 1960 Lincoln or, in the alternative, the sum of $1,612.17 as damages. On July 19, 1965, a second letter was sent to both defendants which stated, in effect, that plaintiff was offering the automobile for sale to two automobile dealers and to a second-hand car dealer and that he would consider any offers from defendants along with the other offers, if received before August 1, 1965.
When defendants failed to respond to his demands, plaintiff offered the car for sale to two automobile dealers in New Orleans. On July 26, 1965, plaintiff accepted an offer of Pattison Pontiac Co. for $4,500, of which $877 was in cash and the balance was by way of a new Pontiac Catalina in exchange. Three days later Pattison Pontiac sold the car to one *202 Richard E. Veasey for $5,400 without making any changes whatever in the vehicle and without informing him of the two previous brake failures. Mr. Veasey operated the automobile without incident thereafter. However in November 1965, the car was returned to Clay-Dutton pursuant to recall orders from Ford Motor Company to have the brake fluid in the braking system replaced with a new type fluid made available by Ford Motor Company to withstand higher degrees of temperatures. Certain hose connections were also replaced.
The primary question which must be resolved before the other issues are reached is whether the plaintiff has proven by a preponderance of the evidence that a defect existed in the braking system of the automobile. This has given us a great deal of difficulty, and we concede that it is a very close question. The factors which we have considered as being of particular significance both for and against a conclusion of latent defect are fairly summarized as follows:
Mr. Gauche has never driven an automobile and his wife was the exclusive driver of the Lincoln Continental in question as well as automobiles previously owned by them. She was past 70 years of age and had been driving more than 50 years. She had driven a 1960 model Lincoln automobile prior to the purchase of the 1965 Lincoln Continental in question. It is reasonable to assume that her driving habits were the same, and if she was a "brake-rider" in 1965, she must also have been a "brake-rider" from 1960 to 1965. Never before had her alleged brake-riding habits caused a brake failure. She had never previously had brake failure for any cause.
All experts are in agreement that brake failure can occur as a result of overheating of the brakes. Their explanation for this is that when pressure is applied to the brake pedal while the automobile is in motion, friction created by the contract of the brake pads or shoes against the rotating discs or drums generates heat which is transmitted to the brake fluid, causing it to reach a boiling point. This produces "vapor locks" or "air pockets" in the fluid lines, thus reducing the resistance to pressure, causing the brake pedal to go to the floor without stopping the automobile. The fluid initially used in the 1965 Lincoln Continentals had a boiling point of 300 degrees Fahrenheit. The improved fluid later used has a boiling point of 500 degrees.
The Ford Motor Company expert, William J. Pfander, testified that prior to 1965, Lincoln Continentals employed drum type brakes on all four wheels, and except for the difference of the disc type on the front wheels introduced in the 1965 model, there was no essential difference. He was asked specifically if the condition which (according to his theory) caused the brake failure on the 1965 Lincoln in question was less likely to occur in the drum type models. He answered: "No, these things happen in drum brakes too." He also testified that as long as he had been with Ford Motor Company, about 25 years, brake failure attributed to "riding the brakes" had been experienced. This he said can be compensated to some degree by putting in a higher boiling point fluid, but always some driver will exceed that. We therefore question why, with the same driving habits, Mrs. Gauche had never before experienced brake failure unless the new type disc brakes were more sensitive to overheating.
On the occasion of the second episode of brake failure, Mrs. Gauche had driven the car an estimated distance of five or six miles. Mr. Pfander was asked if in this relatively short distance at a speed of 30 to 35 miles per hour, it was possible for the brakes to be heated to the boiling point of the brake fluid thus causing the brake failure in accordance with his theory. He answered, "Yes, if they are abusively used.
*203 By thatyou have one proposition, of course. There is this, have your left foot on the brake while you are running the engine and you have got to fight the engine too and that's an abusive situation." This raises the question then, if Mrs. Gauche was a consistent "brake-rider," why had there not been more frequent incidents of brake failure, i. e., every time Mrs. Gauche drove the new car five or six miles?
After the first brake failure and the collision with the Public Service bus, there was a lapse of some 45 minutes before the investigating officer arrived on the scene. We must assume that a few more minutes were consumed in getting a report of the accident before testing the brakes. When he tested them the pedal went to the floor and he found them so defective that he ordered the car impounded for brake inspection by the Police Department brake inspector. We question whether this was not a sufficient lapse of time for the brakes to have cooled to restore the braking power of the system.
After the car had been impounded two or three days, within which time cooling surely took place, the Police Department brake inspector found the brakes defective and described a soft pedal, a "spongy" "mushy" pedal, meaning that the required pressure for effective braking was wanting.
The circumstance of the Ford Motor Company recalling all 1965 model Lincoln Continentals (about 40,000) for certain "modifications" of the braking system is particularly significant. The Ford Motor Company expert, Mr. Pfander, was asked to state the "occasion" which prompted the Ford Motor Company to call back all these cars. He testified:
"A Well, as I understand it there were some allegations on the part of people who were riding the brake with the left foot that they experienced a brake failure. Thiswhen something better was available, some higher temperature fluid was available Ford immediately made it available to all 1965 Lincoln Continental owners. I don't know of anything showing any high incidents whatsoever.
"Q I don't understand.
"A I don't know of any indication where there was high incidents indicating loss of brakes in 1965 Lincoln Continentals.
"Q There was enough complaints that would cause Ford to call in 40,000 vehicles?
"A In my experience Ford has been very sensitive to customers' satisfaction and relies on anything to try to improve the product. When it is ready they will do it."
In answer to interrogatories propounded by plaintiff, Ford Motor Company admitted also that approximately 15 thousand 1965 Lincoln Continentals, being of the "early" production of that model, had been recalled by Ford for inspection because of a "possible weakness" in the master brake cylinders. It asserted that the "approximately 15,000 vehicles" were "potentially" within the group in which inspection had indicated a "possible weakness" but that this related only to those manufactured prior to December 7, 1964, and "as plaintiff's vehicle was manufactured after that date, it was not even conceivably within the scope of said recall campaign procedure." There is no evidence in the record before us indicating the date of manufacture of the automobile in question. We only know that it was in the hands of Ford's retail dealer for sale in January 1965.
Leo J. Rome, shop foreman for Clay-Dutton, testified:
"The brake modification was to flush out the other type of fluid which they introduced a fluid which would take *204 would have a higher heatinga higher boiling point and the hosesreplace the front brake hoses which I think the fluid was the most important thing in this modification and in so doing they flush out all existing brake fluid and install this new brake fluid.
"BY MR. DUTREY:
"Q You did do this on this car?
"A We did.
"Q On whose instructions was that done?
"A Ford Motor Company.
"Q Is this an instruction you had for this particular automobile?
"A No, sir, for all the 1965 Lincolns, all the 1965 automobiles with disc brakes."
Walter A. Daniel, Jr., service manager for Clay-Dutton, testified:
"A The purpose of the modification was we were running across a boiling pointif a person would ride the brakes or drive abnormally we were experiencing some difficulty in our fluid boiling even though our fluid at that time met Federal specifications.
"It is my understanding that this modification was a new type of brake fluid that Ford Motor Company devised with a higher boiling point to eliminate the problem of persons that are riding the brakes."
Pursuant to instructions from Ford Motor Company this Lincoln Continental in question, which was then owned by Mr. Veasey, was returned to Clay-Dutton for the brake "modification" on November 23, 1965. The brake fluid was replaced with the new type and the brake line hoses to the front wheels were replaced. The most significant factor in support of the contention of defendants that Mrs. Gauche abused the brakes is the fact that the car was sold to Mr. Veasey in July 1965 without anything being done to the brakes and thereafter was driven by him over 4,000 miles to November 1965 without incident.
In further support of defendants' contention of overheating caused by the alleged brake-riding habit of Mrs. Gauche, the brake pads and discs removed from the Lincoln after the April 1965 failure were filed in evidence. They bear physical signs of overheating which was pointed out by the experts. These parts were not seriously damaged, however, and might have been continued in use indefinitely except for the insistence of Mr. Gauche that he have new brake parts.
One other factor pointed out by defendants has not been overlooked, namely, the questionable accuracy of the testimony of Warren A. Labiche, the Police Department brake inspector. He testified about his examination of the brake "drums" on all four wheels, whereas there are no drums, but discs, on the front wheels of the automobile in question. The plaintiff seeks to explain this inconsistency as being an inadvertent use of the wrong terminology. We do not think so because Mr. Labiche was questioned closely enough on this point to have corrected an error in this respect. He claimed to have made a thorough inspection and to have found all brake "shoes" and "drums" in good condition; no evidence of leaks in the fluid system; wheel cylinders in good condition, etc., and concluded that there was some fault in the power unit because of an improperly fitting diaphragm. He testified he inspected the external parts of the diaphragm, but admitted that he did not examine the internal parts of the mechanism. In general his testimony indicates some inconsistency and a conclusion which is largely speculative insofar as the cause of the brake failure is concerned.
Whether or not Mrs. Gauche was a consistent "brake-rider," and if so that she kept enough pressure on the foot pedal to activate the power braking system thus causing *205 intense heat to be generated from the friction of the brake pads, is largely a matter of speculation. Her testimony in chief was to the effect that she drove with her left foot on the brake while her right foot was on the accelerator. At one point she used the expression that she kept her left foot "over" the brake. On rebuttal she attempted to qualify her earlier testimony by saying she kept her left foot by the side of the brake pedal.
Testimony of the experts was that some seven or eight pounds is all that is required to activate the power brakes. We think it is entirely possible and more probable than not that Mrs. Gauche did, without awareness, keep enough pressure applied to the brake pedal to activate the power system. This is more believable in view of Mr. Veasey's having driven the same automobile over 4,000 miles without a brake failure.
Our conclusion is that the braking system on the 1965 Lincoln Continental, which for the first time employed the disc type brake in front wheels, was perhaps more sensitive and therefore more susceptible to the possibility of overheating to the point of causing fluid boil and brake failure. This imposes upon the manufacturer the duty to provide compensating safeguards.
The evidence preponderates that the possibility of brake failure from overheating caused by "brake-riders" was well known to Ford Motor Company even though the known instances were relatively rare in the drum type systems prior to 1965. The evidence also preponderates that there was some experience with the 1965 models which indicated to Ford the possibility of brake failure. In those manufactured prior to December 7, 1964, there was a possibility of master cylinder weakness, and in all 1965 models the need of a fluid with a high boiling point. It is not unusual in the manufacture of automobiles for new models employing some change from the conventional system that defects or weaknesses referred to in common parlance as "bugs" do appear. Only experience in the hands of the motoring public can reveal certain weaknesses which the most skilled laboratory technician may not discover. We think this is demonstrated by the recall by Ford of the approximately 15,000 early production 1965 Lincoln Continentals for master brake cylinder inspection and the recall of some 40 thousand 1965 model cars for brake fluid substitution. Certainly Ford Motor Company would not have recalled those cars at tremendous cost except for a substantial reason involving the element of safety. The intimation that the 40 thousand 1965 models were recalled for brake fluid substitution merely because Ford had discovered this new and improved fluid and wanted its customers to have the benefit of it is incredible.
We do not have the benefit of reasons for judgment of the trial judge and do not know if the plaintiff's suit was dismissed for failure to prove a defect or for failure to prove the damages. There is a conflict among counsel in their statements in this respect. At any rate it is our opinion that the plaintiff has discharged the burden of proof that there was a defect or weakness in the braking system of the Lincoln Continental automobile in question. While the defect proven was not one likely to cause brake failure in the hands of an average conventional driver, it was susceptable to failure in the hands of a so-called "brake-rider," and to this extent the defect or weakness was proven. We conclude that if Mrs. Gauche was a "brake-rider" her driving habits were not so abnormal or unusual as to be beyond the experience of Ford Motor Company.
The Court will take judicial notice that Lincoln Continental automobiles are among the finest automobiles produced by the industry. It is not unreasonable to impose upon their manufacturer a high duty of care in engineering design to the end that a near perfect performance may be assured to any potential driver within its wide range of experience.
*206 By its own expert witness, Ford concedes that it has had previous experience with so-called "brake-riders." It should have devised compensating safeguards to protect such potential purchasers of its automobiles against the danger of brake failure which their driving habits were known to produce.
The automobile in question was not safe for the purpose intended and the defect was such as to render it imperfect and so potentially dangerous to plaintiff as to be useless to him. It must therefore be supposed that he would not have purchased it had he known of the vice. LSA-C.C. art. 2520.
By the foregoing conclusion we do not mean to imply that a manufacturer of automobiles or other complicated machines should be required to anticipate every known or potential abuse to which its manufactured article may be subjected and to design a product capable of withstanding such abuse. We are in complete accord with the decisions which have denied recovery in cases where the facts indicated that the thing had been subjected to excessive abuse. Ditta v. Polk Chevrolet, Inc., 196 So.2d 672 (La.App. 1st Cir. 1967); Tri-State Tractor Company v. Nethercutt, 168 So.2d 855 (La.App.2d Cir. 1964); Bickham Motors, Inc. v. Crain, 135 So.2d 649 (La.App. 1st Cir. 1961). We held in a recent case that there is ample authority for the application of the codal articles on redhibitory vices to the sale of automobiles and that it is a question of fact whether the imperfections are such as to bring the particular case within the authority of those provisions. See Stumpf v. Metairie Motor Sales, Inc., 212 So.2d 705 (1968), and cases there cited.
The plaintiff seeks recovery from Ford Motor Company, relying on the doctrines of res ipsa loquitur, strict liability as the manufacturer, and warranty against hidden defects. As against Clay-Dutton, Inc., he pleads the resolutory condition as defined in LSA-C.C. arts. 2045-47 and error as to the thing and quality of the object of the contract as defined in LSA-C.C. arts. 1842-45. He concludes his petition with a prayer for judgment against the defendants in solido for $2,912.72, which represents the loss or difference in value of the automobile on account of the defect and certain items of special damage. It will readily be seen that he seeks recovery from the defendants on two distinctly different alleged causes or rights of action. We will address ourselves first to his action against Clay-Dutton, Inc.
LSA-C.C.P. art. 2164 confers upon us the right and duty to render any judgment which is just, legal, and proper upon the record on appeal. It repudiates the "theory of the case" doctrine insofar as the procedural law of Louisiana is concerned. We are therefore not bound by the theory implied by the codal articles specifically pleaded by plaintiff and are free to apply to the facts before us the codal articles which are more relevant and upon which plaintiff is, in our opinion, entitled to recovery.
We have held that there was a redhibitory vice in the automobile purchased by plaintiff from Clay-Dutton, but there can be no avoidance or rescission of the sale for the reason that the parties cannot now be restored to their status quo. This will not however preclude recovery in quanti minoris, which in reality is the object of plaintiff's suit as against Clay-Dutton. LSA-C.C. arts. 2541-44. Bayou Rapides Lumber Co. v. Davies, 221 La. 1099, 61 So.2d 885 (1952); Ehrlich v. Roby Motors Co., 166 La. 557, 117 So. 590 (1928); Papa v. Louisiana Metal Awning Company, 131 So.2d 114 (La.App.2d Cir. 1961); Lemonier v. Coco, 130 So.2d 414 (La.App. 4th Cir. 1961).
The purchase price of the automobile was $7,412.72. It was driven by plaintiff a total of 630 miles during the less than six months in plaintiff's ownership and *207 possession. Plaintiff notified Clay-Dutton and Ford of his intention to sell the automobile on a competitive basis and gave them an opportunity to make an offer of purchase. Receiving no reply from defendants, he proceeded to dispose of the automobile in good faith, giving notice to prospective purchasers of the defect. In our opinion he made a reasonable effort to minimize the loss.
He sold or gave the automobile in exchange to a reputable automobile dealer, Pattison Pontiac Co., for which he received $4,500. Within a few days and without incurring any expense for repair, Pattison sold the automobile for $5,400. The price paid by Pattison to plaintiff was the trade-in or wholesale price and did not represent the true value of the automobile on the competitive retail market. It may reasonably be assumed that Pattison sold the car for its full retail value as a used car. There is no other evidence in the record relating to value, and we therefore accept this figure as the basis for computing the reduction of price.
Plaintiff had the use of the automobile approximately six months, and we will take into account also the depreciation of the automobile as a used car. There is no evidence upon which we can rely to determine the depreciation or the amount of credit to allow for plaintiff's use of the automobile. This question was presented in Bergeron v. Mid-City Motors, Inc., 162 So.2d 835 (La.App. 1st Cir. 1964). In that case the trial judge in his reasons for judgment said, "* * * as a matter of my own discretion and what I consider to be fair use for an automobile for nine thousand miles for one year * * *" and allowed $1,000 which he then reduced to $500 for certain offsetting reasons. The Court of Appeal affirmed the judgment giving approval to the trial judge's discretionary action in this respect.
A remand of the case for testimony to be taken on this issue is too impracticable to conduce to the ends of justice. Accordingly we will exercise our discretion on this point and will allow a credit of $500 for depreciation and use of the car for 630 miles over the period of plaintiff's ownership, which was just under six months.
The plaintiff sought recovery of certain items of expense as special damage which he has abandoned and waived in this Court. There are two items not waived for which plaintiff continues to seek recovery. One is reimbursement of the $116.08 paid Clay-Dutton for replacement of brake pads and discs, also referred to as rotors, in the front wheel brake assemblies. Clay-Dutton asserted a lien and refused to deliver the car to plaintiff until this amount was paid. It was paid by plaintiff under written protest.
Clay-Dutton's defense as it relates to this special item is that the parts in question were not damaged and did not need replacement, but were replaced only to placate plaintiff who was demanding that the brakes on the car be replaced. The plaintiff is not required to know the cause underlying the defective condition of which he complains, especially where it relates to complicated machinery. Crawford v. Abbott Automobile Co., 157 La. 59, 101 So. 871 (1924); Bergeron v. Mid-City Motors, Inc., supra; Harris v. Automatic Enterprises of Louisiana, Inc., 145 So.2d 335 (La.App. 4th Cir. 1962). All the plaintiff knew was that the brakes on his Lincoln automobile had failed at just over 400 miles. He assumed, and we think with good reason, that the brakes were defective. He was not unreasonable in his fear to drive the car with defective brakes and his demand that they be replaced. Clay-Dutton's replacement of certain parts of the entire brake system, which they contended were not defective but merely to placate plaintiff and hopefully relieve his fears, can hardly be justified, especially when the replacement of the parts did not correct the defect complained of. It was a useless procedure involving a complicated device *208 for which the defendants, as experts, should be held responsible.
There was an item of $18.54 representing a wrecker charge paid by plaintiff on the occasion of the second brake failure. This is a legitimate item of damage and will be allowed.
We therefore conclude that the difference between the purchase price ($7,412.72) and the value of the automobile at retail ($5,400), or the sum of $2,012.72, is the amount in quanti minoris which represents the diminution of value and the reduction of price for which plaintiff is entitled to recover. LSA-C.C. art. 2543. This amount will be reduced to $1,512.72 by subtracting $500, which we have determined to be the value of the use of the car to plaintiff. To this figure, we will add $116.08 and $18.54 for the special items of damage, making the amount of recovery to plaintiff $1,647.34.
We will now address ourselves to plaintiff's action against Ford Motor Company. We have held that a vice or defect existed in the automobile for which plaintiff has a right of recovery against his vendor. The defect, however, resulted from the fault of the manufacturer of the automobile, Ford Motor Company. We are fully cognizant of the relatively recent emergence of the theory of products liability and the widespread attention the subject has received from the courts and legal scholars.[1] It is not the purpose of this opinion to attempt a dissertation on the subject. There has been some conflict of theory between the contractual concept founded on warranty and the tort concept founded on negligence. The former places much emphasis on the privity requirement between the manufacturer and the consumer. The latter concept is invoked irrespective of privity.
The courts of Louisiana have in many cases involving commodities of food and beverage for human consumption applied the theory of tort-negligence and have held the manufacturer liable for breach of warranty in the fitness of the commodity for human consumption. Le Blanc v. Louisiana Coca Cola Bottling Co., 221 La. 919, 60 So. 2d 873 (1952); Reine v. Baton Rouge Coca Cola Bottling Company, 126 So.2d 635 (La.App. 1st Cir. 1961); Morrow v. Bunkie Coca Cola Bottling Company, 84 So.2d 851 (La.App.2d Cir. 1956); and cases cited therein.
More recently the principle has been applied in cases of personal injury resulting from latent defect in automobiles and other manufactured products. Recovery has been denied in some cases because of factual situations peculiar to the case, but the principle has been recognized and applied. Shanks v. Insurance Company of North America, 211 So.2d 729 (La.App.2d Cir. 1968); Arnold v. United States Rubber Company, 203 So.2d 764 (La.App. 3d Cir. 1967); Meche v. Farmers Drier & Storage Company, 193 So.2d 807 (La.App. 3d Cir. 1967); Samaha v. Southern Rambler Sales, Inc., 146 So.2d 29 (La.App. 4th Cir. 1962).
Since the theory of liability rests in tort-negligence, it is incumbent upon one seeking recovery against the manufacturer to prove fault, and this has brought into application the doctrine of res ipsa loquitur in certain cases.
If the fault in this case lies in a latent defect in the complicated mechanism of the brake system, the application of the *209 doctrine of res ipsa loquitur would impose on Ford the burden of explaining the cause and the exoneration of itself from the presumption of fault. If, however, the cause of the brake failure lies in the known possibility of failure from overheating due to brake riding, fault would lie in the failure of Ford to foresee the potential danger of injury or damage without intervening negligence and its failure to warn of the danger or take other appropriate measures to avoid injury. From the facts related above, we have shown that Ford knew from its experience that its cars were sometimes purchased by brake-riders and the potential danger from such driving habits.
In the owners manual printed and published by Ford, there is a warning of possible danger of damage to the brakes by brake riding, but there is no warning that such habit could cause a total brake failure with possible tragic consequences. We therefore hold that Ford's fault has been proven and that it is causally connected with the damage sustained by plaintiff.
We can conceive of no sound reason why the principle of manufacturers' liability should be limited to personal injury cases any more than it should have been restricted to commodities of food and beverage. LSA-C.C. art. 2315 certainly places no limit on liability of "him by whose fault" a damage is caused to another. Fortunately, if not by miracle, there was no personal injury to plaintiff or his wife or other persons. He should not be denied recovery from the manufacturer merely because his damage is measurable in terms of financial loss.
It is our opinion that plaintiff was justified in his fears concerning this particular automobile and was not unreasonable in disposing of it. In doing so he sustained a financial loss, which is a damage to him causally connected with the fault of Ford Motor Company. Continued use of the automobile, very conceivably, could have caused grave, perhaps fatal injury and great loss, which under the rationale of this opinion would have been the ultimate liability of Ford. It should not complain that plaintiff chose to follow a course to avoid this potential liability.
We have pointed out the distinct difference of causes or rights of action against the two defendants. Irrespective of the difference, it is our conclusion that the defendants are each liable to the plaintiff for the same thing. They are each liable for the damage sustained, namely $1,647.34, though the bases of their liability may be distinguished legally. This is not a situation where each defendant is liable to plaintiff in an equal amount, but rather one in which they owe the same identical $1,647.34. Therefore, we hold they are liable in solido under the authority of LSA-C.C. arts. 2091 and 2092, which are as follows:
"There is an obligation in solido on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor." LSA-C.C. art. 2091.
"The obligation may be in solido, although one of the debtors be obliged differently from the other to the payment of one and the same thing; for instance, if the one be but conditionally bound, whilst the engagement of the other is pure and simple, or if the one is allowed a term which is not granted to the other." LSA-C.C. art. 2092.
We have held that the underlying cause for which both defendants are liable is the defect in the automobile which, in the final analysis, is chargeable to the fault of the manufacturer, Ford Motor Company. Since the defendant Clay-Dutton did not appeal the judgment against *210 it in favor of its third-party defendants, Ford Motor Company and Insurance Company of North America, rejecting its third-party petition for indemnity against them, that judgment is final. We are powerless to grant Clay-Dutton's prayer for third-party judgment against Ford and its insurer for the reason that the issue is not before us on this appeal. LSA-C.C.P. art. 2087; McCoy v. Pacific Coast Fire Insurance Co., 248 La. 389, 178 So.2d 761 (1965). The situation of the defendant and third-party plaintiff in McCoy was identical to that of Clay-Dutton here, except that in McCoy there was no judgment in the trial court specifically dismissing the third-party petition. In this case the judgment expressly adjudicated the third-party issue against the third-party plaintiff, from which it did not appeal.
For these reasons, the judgment in favor of defendants against the plaintiff rejecting his demands and dismissing his suit is reversed. Judgment is now rendered in favor of plaintiff, Raymond Gauche, against the defendants, Ford Motor Company and Clay-Dutton, Inc., in the sum of $1,647.34 in solido, with legal interest thereon from date of judicial demand and for all costs of court.
Reversed and judgment rendered.

ON REHEARING
We granted a rehearing herein not so much because of any uncertainty with regard to our fact finding of a defect in the braking system in plaintiff's automobile, but rather to give further consideration to the legal principles upon which we held Ford Motor Company liable. While we remain convinced that the brakes were defective, we are concerned about our conclusion as to negligence or fault on the part of that defendant.
The brakes completely failed on two occasions, the first time at less than 500 miles and the second time at just over 600 miles. The second failure occurred after the car was driven a distance of five or six miles from plaintiff's home. This is most unusual in a new automobile. The testimony of the police officer who investigated the accident which resulted from the first failure and that of Warren Labiche, brake inspector for the police department, convinces us that the brakes were ineffective after a sufficient interval of time for cooling. Inspector Labiche was speculative as to the cause of the failure but was certain of the brake defect.
Defendants have attempted to attribute the proven brake failures to abusive driving habits of Mrs. Gauche. Their position in this regard is in large measure founded on their theory of overheating. They cannot point to any known cause of failure and resort to the speculative circumstance that Mrs. Gauche must have ridden the brakes excessively.
The circumstance of Mr. Veasey having driven the automobile for 4,000 miles without a brake failure and without repairs or adjustments would certainly tend to corroborate defendants' theory of overheating by brake-riding, but, on the other hand, we have the circumstance of recall of the automobile along with 40,000 others of that model for a corrective modification of the braking system. This circumstance, in our opinion, tips the scales in favor of a preponderance of evidence that the brakes on plaintiff's automobile were in fact defective.
The defendant Ford Motor Company has cited an impressive list of authorities which have applied the principles of law summarized as follows:
"Whilst some courts hold to the contrary * * * the great weight of authority is that evidence of changes or repairs made subsequently to the injury, or as to precautions taken subsequently to prevent recurrence of injury, is not admissible as showing negligence or as amounting to an admission of negligence. The reason for the rule is that the effect of declaring such evidence competent *211 would be to inform a defendant that, if he makes changes or repairs, he does it under a penalty; for, if the evidence is competent, it operates as a confession that he was guilty of prior wrong. True policy and sound reason require that men should be encouraged to improve, or repair, and not be deterred from it by the fear that if they do so their acts will be construed into an admission that they had been wrongdoers. A rule, which so operates as to deter men from profiting by experience and availing themselves of new information, has nothing to commend it, for it is neither expedient nor just. * * *" Givens v. De Soto Bldg. Co., 156 La. 377, 100 So. 534, 535 (1924), citing 29 Cyc. 616 (verbo Negligence). See also Columbia & P. S. R. Co. v. Hawthorne, 144 U.S. 202, 12 S.Ct. 591, 36 L.Ed. 405 (1892); Currier v. Saenger Theaters Corporation, 10 So.2d 526 (La. App. 1st Cir. 1942); Devore v. Louisiana & Arkansas Ry. Co., 178 So. 706 (La. App. 2d Cir. 1938) Eastern Air Lines, Inc. v. American Cyanamid Company, 321 F.2d 683 (C.A. 5th Cir. 1963); Cox v. General Electric Company, 302 F.2d 389 (C.A. 6th Cir. 1962); Northwest Airlines v. Glenn L. Martin Company, 224 F.2d 120, 50 A.L.R.2d 882 (C.A. 6th Cir. 1955); Hammill v. Hyster, 42 F.R.D. 173 (D.C.1967).
These authorities clearly support Ford's contention that we were in error in considering the circumstance of its recall of the automobiles as evidence of its "negligence" or actionable fault in the manufacture of plaintiff's automobile. We concede our error in this respect, but we fail to find anything in any of the authorities cited holding that such circumstance cannot properly be considered in corroboration of other evidence of the existence of a defect in the braking system of the particular automobile.
Our judgment insofar as it holds Ford Motor Company negligent and answerable in damages to plaintiff was in error and must be recalled. Our opinion that a redhibitory vice or defect in the automobile was proven remains unchanged, and the judgment against Clay-Dutton, Inc., will not be disturbed. For reasons stated in our original opinion, Clay-Dutton's third-party petition against Ford is not before us on appeal and cannot be considered.
Our original decree is now recalled and set aside. The judgment appealed is reversed insofar as it rejected plaintiff's demands against Clay-Dutton, Inc., and there is now judgment in favor of plaintiff, Raymond Gauche, against the defendant Clay-Dutton, Inc., in the full sum of $1,647.34 with legal interest from judicial demand. In all other respects the judgment appealed is affirmed. The defendant-appellee, Clay-Dutton, Inc., is cast for all costs.
Original decree recalled; judgment affirmed in part; reversed in part and rendered.
NOTES
[1] Among the treatises and cases we have read and considered are the following: Percy, Products LiabilityTort or Contract or What?, 40 Tul.L.Rev. 715 (1966); TortsThe Emergence of Strict Liability in Products Cases, 26 La.L.Rev. 447 (1966); Comments, 19 La.L.Rev. 165 (1958); Warranty of Quality in Louisiana: Express and Implied-in-Fact Warranties, 23 Tul.L.Rev. 83 (1948); Restatement, Second, Torts § 402A, and comments thereunder; Lartigue v. R. J. Reynolds Tobacco Company, 5 Cir., 317 F.2d 19 (1963).