273 So.2d 331 (1973)
Jeanette Jean TRAHAN et al., Plaintiffs-Appellants,
v.
LIBERTY MUTUAL INSURANCE COMPANY et al., Defendants-Appellees.
No. 4067.
Court of Appeal of Louisiana, Third Circuit.
January 29, 1973.
Rehearing Denied March 7, 1973.
Writ Refused April 12, 1973.
Armentor & Wattigny, by Gerard B. Wattigny, Milton LeBlanc, Jr., and Henry A. Bernard, Jr., New Iberia, Broussard, Broussard & Moresi by Paul G. Moresi, Jr., Thompson & Sellers by Roger C. Sellers, Abbeville, for plaintiffs-appellants.
Davidson, Meaux, Onebane & Donohoe by John G. Torian, II, Lafayette, Scofield, Bergstedt & Gerard by Thomas M. Bergstedt, Lake Charles, for defendants-appellees.
Before FRUGE, HOOD and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
We are concerned in this case, and in those of Chrzanowski et al. v. Liberty Mutual Insurance Company et al., La.App., 273 So.2d 338; Nunez et al. v. Liberty Mutual Insurance Company et al., La.App., 273 So.2d 339; Fuselier et al. v. Liberty Mutual Insurance Company et al., La.App., 273 So.2d 339, all of which were consolidated for trial and have remained so on appeal, with the appeals of trial court judgments based on a jury verdict, dismissing the claims of four widows and their children against six executive officers of their late husbands' employer, and their insurers. The facts and law, insofar as is relevant to our conclusion, are common to all four cases and we therefore discuss them only in this opinion. Separate judgments based on the discussion and reasons herein contained will be rendered in each of the other three cases.
On February 19, 1970, the four decedents, Josef Chrzanowski, John Hollier, Obra Suire, and Lennis Landry were in the employ of Diamond Crystal Salt Company *332 in the latter's mine at Jefferson Island, Louisiana. At approximately 7:00 A.M. that morning the four men entered the salt mine, which was then being worked at the 1,300 foot level (actually 1,241 feet below sea level) and commenced operations in an area called SW3. Approximately two hours later, while the four men were in a corridor measuring 30 feet in height and 70 feet in width, a huge slab of salt fell from the ceiling and killed all four.
Their widows filed suit, for themselves and on behalf of their children, against six executive officers of Diamond Crystal, alleging that their negligence was the sole cause of the accident, and against their liability insurers, Liberty Mutual Insurance Company, and The Insurance Company of North America. The six officers were: Russell Rudolph, executive vice-president of Diamond Crystal; Charles Cronenworth, production superintendent of Diamond Crystal; Gayle Petrick, plant manager at Jefferson Island; Richard Sieferman, mine superintendent at Jefferson Island; Charles Dixon, mine engineer at Jefferson Island, and Paul C. Bergeron, superintendent of administrative services at Jefferson Island. The defendants denied the plaintiffs' allegations and additionally pled the contributory negligence of Josef Chrzanowski, general mine foreman at Jefferson Island, and John Hollier, shift production foreman.
The trial lasted two weeks, after which time the jury rendered a verdict absolving all defendants of liability. All of the plaintiffs appealed alleging that error was committed in the following specifics:
1. The trial court did not charge the jury on the doctrine of res ipsa loquitur.
2. The trial court refused to allow the introduction of evidence regarding roof control practices in the mine after the accident.
3. The verdict and the judgments thereon were clearly and manifestly erroneous and contrary to the weight of the law and the evidence.
The first specification of error is disposed of by Article 1793 of our Code of Civil Procedure which reads as follows:
At the close of the evidence or at an earlier time during the trial as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.
The record is devoid of any indication that plaintiffs objected to the trial judge's failure to give the instructions regarding res ipsa loquitur, and indeed the plaintiffs do not allege that they made such objection. Accordingly, plaintiffs may not complain of the matter on appeal. Mulkey v. Aetna Casualty and Surety Company, La. App., 210 So.2d 897; Gryder v. Travelers Insurance Company, La.App., 193 So.2d 532.
In any event, we do not consider the doctrine of res ipsa loquitur to be applicable to the case at bar.
Three elements are necessary to the application of res ipsa loquitur. The plaintiff must show that:
1. The offending instrumentality was within the exclusive control of the defendant, or the freedom from fault of all persons through whose hands it passed after leaving the defendant's exclusive control.

*333 2. The explanation of the occurrence of the accident is more readily available to the defendant than it is to the plaintiff.
3. The accident was such as would not ordinarily occur in the absence of negligence.
In evaluating the first prerequisite in light of the evidence we note imprimis that the plaintiffs are suing not the Diamond Crystal Salt Company, owner of the mine, but rather six of its employees. The evidence shows that each defendant had some control of the mine, but none had exclusive control. Neither did the defendants as a group have the exclusive control of the mine. The evidence is clear that Josef Chrzanowski as general mine foreman, and John Hollier as shift production foreman, shared in the control of the mine, with the former's power being at least as great as that of some of the defendants. This is conceded by plaintiffs in their brief wherein they indicate their recognition of the possibility that the doctrine of res ipsa loquitur would not be applicable to Chrzanowski and Hollier. The mere fact that those two individuals shared in the control, of course, defeats the exclusivity of the defendants' control and we therefore need look no farther for other persons who might have shared therein. Accordingly it is seen that plaintiffs have not met even the first criterion for the application of res ipsa loquitur and we therefore readily conclude that the doctrine is inapplicable to the case at bar.
Plaintiffs' second specification of error is likewise without merit. The rule that evidence of improvements made by the defendant after the accident is inadmissible, was announced by our Supreme Court in Givens v. De Soto Building Company et al., 156 La. 377, 100 So. 534, with the following language:
In 29 Cyc. 616 (verbo Negligence), we find:
"Whilst some courts hold to the contrary (Kansas and Utah) the great weight of authority is that evidence of changes or repairs made subsequently to the injury, or as to precautions taken subsequently to prevent recurrence of injury, is not admissible as showing negligence or as amounting to an admission of negligence. The reason for the rule is that the effect of declaring such evidence competent would be to inform a defendant that, if he makes changes or repairs, he does it under a penalty; for, if the evidence is competent, it operates as a confession that he was guilty of prior wrong. True policy and sound reason require that men should be encouraged to improve, or repair, and not be deterred from it by the fear that if they do so their acts will be construed into an admission that they had been wrongdoers. A rule, which so operates as to deter men from profiting by experience and availing themselves of new information, has nothing to commend it, for it is neither expedient nor just. No one should be placed in the embarrassing attitude of being compelled to choose between the risk of another accident by maintaining the status quo, and the equally uninviting alternative of taking proper steps to remove the danger and thereby `making evidence against himself which would act prejudicially to his defense in the minds of the jury.'"
Plaintiffs direct our attention to the case of Gauche v. Ford Motor Company et al., 226 So.2d 198, wherein is contained some dicta indicating that evidence of repairs made subsequent to the accident may be admissible in corroboration of other evidence of negligence. In our opinion our brothers of the Fourth Circuit Court of Appeal deviated from the rule of Givens, supra, by their expression of those views. Our Supreme Court has in no way modified or deviated from the Givens holding excluding such evidence, and we are therefore bound to follow it. Accordingly we reject plaintiffs' arguments in this regard.
Plaintiffs' third specification of error attacks the jury's verdict in general *334 and we therefore turn now to an examination of the entire case against the defendants.
The evidence shows that the mining operations at Diamond Crystal Salt Company's Jefferson Island mine descended from the 1,000 foot level to the 1,300 foot level in 1965. At that time the company called in a Canadian mining consultant firm, C.I. M., to make an investigation and render advice regarding how they should proceed at the new depth. C.I.M. recommended, inter alia, that the room size be increased from 65 to 100 feet in width. The consultants' recommendations were followed and the rooms at the 1,300 foot depth were made 100 feet wide with cross cuts, or corridors, 70 feet wide.
Certain roof control measures were put into effect, consisting primarily of scaling, a process of tapping the roof with a steel bar and visually observing it to determine if there are any loose scales of salt, and if so knocking them down. Roof bolts, 6 to 10 foot steel rods with an anchoring device at the top and a large steel washer at the bottom, that are inserted into the roof, were used in the dining area, the working area, and in areas where men gathered during blasting operations. Because a salt fall from a brow, an area where a high roof room joins a low roof room, had killed a visitor to the mine in 1964 on the 1,000 foot level, all brow areas were also roof bolted. In addition, an effort was made to avoid the creation of brows on the 1,300 foot level.
There were some five occasions when it became necessary to knock down portions of the roof, all of which were associated with the presence of oil and gas. In 1967 a large undetected roof fall, in which no one was injured, took place on the 1,300 foot level. It too was in an area of oil and gas and it was decided that all areas of oil and gas should be roof bolted. This practice was in effect and being carried out at the time of the accident now before us.
Also available, but sparsely used, was a device known as a stratascope. This is a periscope-like instrument of some ten feet in length having prisms at both ends and a light at the top. It is used by inserting it into a hole drilled in the roof or wall of the mine and moving it up and down while looking for faults in the salt structure.
Finally, some metal rods known as sag pins were infrequently used to measure the convergence of ceiling, walls and floor. These were inserted into the salt at measured distances from each other. Subsequent measurement of the distance between them would indicate whether the walls or ceiling were sagging. Sag bolts served the same purpose but were used by inserting them into a hole and taping them at the point of entry. Thus, if the roof sagged, it would be noticeable by observing its position in relation to the tape.
In 1966 one Mr. Smith, who had done most of the work for C.I.M. at the Jefferson Island mine, returned to re-evaluate the situation there. He determined that the roofs were stable except in areas of oil and gas.
The Bureau of Mines of the U.S. Government's Department of the Interior made periodic inspections of the Jefferson Island mine. In 1964, following the fatal accident involving a salt fall from a brow, above referred to, the Bureau of Mines made an inspection and rendered a formal report. Among the recommendations made therein we find one stating that, "The idea of roof-bolting roofs should be considered especially at areas where low-roof and high-roof rooms connect." The defendants interpreted this to mean that brows should be roof-bolted and they set out to roof bolt or eliminate all brows. Plaintiffs on the other hand believe that the recommendation was to roof bolt all areas of the mine regardless of whether they were brows or not.
In 1967 the Bureau of Mines was again called in because of the trouble that was being experienced in areas of oil and gas *335 in general and because of the above referred to salt fall in SW2 in particular. A Mr. Whitaker and a Mr. Brown from the Bureau of Mines went to Jefferson Island and made an inspection. They also, at that time, introduced the personnel at the Jefferson Island mine to the stratascope. Defendant Dixon and decedent Chrzanowski both accompanied Whitaker and Brown on their tour and both used the stratascope when it was demonstrated.
No formal report was made by the Bureau of Mines on that occasion, but Dixon wrote a memorandum to co-defendant Sieferman setting out what observations and recommendations had been made. The memorandum contains an introductory paragraph, and is then divided according to subject matter. Under the title, "Gas Pockets', Dixon wrote that Whitaker had suggested the purchase and use of a stratascope. If a horizontal bedding plane should be discovered by the use of the stratascope, then the area should be roofbolted. Still under the same title (Gas Pockets) Dixon wrote about a recommendation that sag bolts be installed in the roof throughout the mine and checked periodically for major changes in roof deflection.
Here again plaintiffs and defendants are at odds in their interpretation of the memorandum, with plaintiffs arguing that the recommendations were made for application in the entire mine, and defendants pointing to the title under which they are found, and taking the position that they refer only to areas of oil and gas.
Credence is lent to the defendants' point of view regarding the Bureau of Mines recommendations by the last report of that agency to be rendered before the fatal accident. On October 28 and 29, 1969, the Bureau of Mines made an inspection of the Jefferson Island mine and Mr. Roy Capps, the Safety Representative of the Bureau, wrote in his report:
The roof was a hard and firm native salt. Timbering was not done, as the roof was generally self supporting. Rooms remained open several years after they had been abandoned. Sufficient pillars were left to prevent subsidence.
A systematic method of roof control was adopted. The roof was examined daily by a designated person, and scaling was done with a scaling rig. The miners tested the roof before other work was begun. Rock bolts were used to support ribs and in questionable roof area.
Although a number of recommendations were contained in that report, none referred to roof control. It is therefore a reasonable conclusion that the Bureau of Mines was satisfied that roof control was adequate at Jefferson Island, which in turn would seem to indicate that its previous recommendations had not been ignored.
The plaintiffs produced two experts who testified at the trial, Dr. Donald H. Kupfer, a professor at Louisiana State University, and Mr. Fred Bates, a consulting geologist and engineer. The testimony of these gentlemen explained just how it is that a ceiling falls in a salt mine.
Dr. Kupfer, who was employed by Diamond Crystal after the accident to evaluate the cause and prevention of such falls, explained that salt is an elastical viscous material, meaning that it possesses both elastic and viscous properties. He added that the deeper one goes into the earth, the higher the temperature and the pressure. When an artificial opening is made deep in the earth, such as a salt mine, the natural tendency of all sides, including ceiling, floor, and walls, is to move inward and try to close the opening. When this happens exfoliation joints, or cracks, may form and run generally parallel to the walls or ceiling. These cracks usually grow laterally once they are formed. If they occur far enough above the ceiling so that the salt remaining between crack and ceiling is sufficiently thick to support itself, the ceiling will remain stable, but if they occur near enough to the ceiling, it will fall. The crack could also cause the ceiling to *336 sag slightly in the center (a fraction of an inch) prior to falling.
Dr. Kupfer mentioned a number of factors that he thought to have contributed to the accident when he first began his study. After subsequent consideration, however, he concluded that most of those first impressions had little if any valid applicability in the Jefferson Island mine. For example, he considered the number one factor, in terms of importance, to have been the character of the salt. He explained that darker salt seemed to be more prevalent in areas where he had observed slabbing in salt mines in general. This was not true, however, of the Jefferson Island mine, where the color of the salt in areas of slabbing was not so dark as in other mines. He was equally inconclusive about most of the factors that he mentioned, but he did think that the size of the rooms and the depth of the mine were noteworthy, as it was his opinion that the larger the opening and the deeper it is, the more likely the formation of cracks. Dr. Kupfer concluded by confirming the general lack of real concrete knowledge of salt mining in Louisiana, other than practical experience, and stating that he knows of no literature on the subject.
Mr. Bates agreed with most of what Dr. Kupfer testified to, but then went farther. He stated that salt at a depth of 1,300 feet may be 10 degrees hotter, and have a pressure on it of 400 lbs. per square inch more, than salt lying 800 feet below the surface. It was his opinion that any opening in salt in excess of 70 feet is dangerous, and that any impurity in salt, be it moisture, rock, or hydrocarbons, indicates potential weakness.
Mr. Bates expressed the view, based on the size of the fatal fall, that a crack at least 1/16 of an inch in size must have existed for a period of several days before the ceiling collapsed. He also thought that the roof must have sagged to the point of being detectable through the use of sag pins. His testimony on the question of roof bolts leads to the conclusion that if roof bolts had been installed in the area, they would have been more than adequate to sustain the weight of the salt that fell.
The strength of that testimony was somewhat diminished by Mr. Bates' admissions that his only dealings with salt mines have been to the extent of examining intrusions of water or impurities and advising the companies as to whether they constitute a safety hazard and how they can be avoided. He has never acted as a consultant in the day to day operations of a mine, and he has never recommended the use of roof bolts or sag pins. Prior to the accident he did not know what a stratascope was, and he has never used one. He did not go into the Jefferson Island mine to try to determine what caused the fall and has made no tests in that regard.
Mr. Bates testified that he has been retained by the owners of the Avery Island, Louisiana, salt mine continuously since 1949. This was denied by a third expert, who testified on behalf of the defendants, Edward P. Terrell, Jr.
Mr. Terrell had worked at the Avery Island mine for some forty years, and had been its manager for eight years. He made the statement that to his knowledge Mr. Bates had never done any work for his company, and that had Mr. Bates been employed by his company, he felt as though he would have known of it. He added that about three months prior to the trial Mr. Bates had called him to inquire as to the weight of salt and he had told him. He also said that Mr. Bates had asked him what his opinion was on roof bolting in salt mines, and that when he replied that he saw no usefulness in the measure, Mr. Bates expressed agreement with that view.
Mr. Terrell went on to say that the salt at Avery Island is very similar to that at Jefferson Island, with the exception that the Avery Island dome contains only minute *337 quantities of oil and gas. Nevertheless they have never had any problem with roof control at his mine in spite of the fact that his rooms range in width from 100 to 150 feet. No one has ever been injured by falling salt at Avery Island since the mine was opened in 1898, and they have never had a scale fall larger than a couple of hundred pounds. Their method of roof control is to scale the roof and ribs (walls) as is done at Jefferson Island. He did not think that roof bolts or sag pins are necessary in day to day mining operations. In his mine they use a measuring device called a dilatation pin when they make a change of any magnitude in the mining procedure, as when they went from 70 foot rooms to 150 foot rooms. These will record movement of salt to within five thousandths of an inch. He stated that the minor falls that they have had have occurred in areas of white as well as dark salt and that this has no significant bearing on scale falls.
The Bureau of Mines is, in Mr. Terrell's opinion, generally a reliable agency, but it has very few people who know anything about salt mines. The Bureau has never made any recommendations to him regarding the use of roof bolts, sag or dilatation pins, or the stratascope.
The testimony of the defendants was uniform in its tenor and we therefore treat it as a whole. It was basically to the effect that there was no reason to suspect that any problems would be encountered in the area of the fatal fall. The presence of impurities in the salt was not considered to be any indication of danger, as such impurities had been encountered in large volume elsewhere in the mine and had caused no difficulty. This is supported not only by the testimony of the defendants but also by the weekly situation reports of the Jefferson Island mine which were admitted into evidence. The only places that they had experienced roof control problems was in areas of oil and gas, and all such areas were roof bolted. The defendants took the position, in this connection, that in roof bolting all areas of oil and gas they were going beyond the recommendation of the Bureau of Mines made in 1967 which was, in the defendants' view, to stratascope areas of oil and gas and roof bolt them only if the stratascoping revealed a reason to do so. There was no oil or gas in the area of the fatal salt fall of February 19, 1970.
As to the stratascope, the defendants testified that all supervisory mine personnel, including Chrzanowski and Hollier, had the right to use it whenever they deemed proper. The instrument was left in defendant Dixon's office topside and the office was often locked, but a number of personnel had keys to the office and all it would take for the stratascope to be sent down into the mine would be a telephone request for it.
In reference to the plea of contributory negligence, the defendants testified that Chrzanowski was the man that was basically in charge of the roof bolting program. He in fact once bolted an area 300 feet long, the area of the 1967 fall, on his own initiative. Although Chrzanowski had no formal training as such, he did hold a certificate from the British Society of Mining Engineers that he considered, according to defendant, Petrick, as substantial as a degree in mining engineering. Hollier, as a shift foreman, had the authority to order the use of the stratascope or the installation of roof bolts during his shift. Although he could not order the roof bolting of the entire mine, neither could most of the defendants, and he could make recommendations in that regard, as could Chrzanowski and the lower ranking defendants.
In summary then, the evidence shows that the salt fall of February 19, 1970, was probably preceded by the formation of a crack above the ceiling which went undetected. Whether the crack could have been discovered by the use of the stratascope *338 and/or the use of sag pins and bolts is not clearly established, but at least the testimony of Mr. Bates would seem to indicate that it could have been. Likewise, his testimony indicates that had the ceiling in NW3 been thoroughly roof bolted the accident would not have happened.
On the other hand, it was shown that the defendants had no reason to suspect that there was any danger in that area. Many of them had in fact stood under the offending ceiling shortly before the fall. All of the roof problems that had been experienced were in areas of oil and gas and there was no oil or gas within 1,800 to 2,000 feet of the fatal fall. There were impurities such as rock, moisture, and anhydrite present in the area of the 1970 fall, but all of these had been encountered elsewhere in quantity and had caused no problems. It appears that the Bureau of Mines was satisfied with the roof control measures being employed at the mine. Indeed, its recommendations in that regard were, if one accepts the defendants' view point, not only complied with but even exceeded. Finally, Mr. Terrell established that although his rooms were wider and he did not make the use of such aids as roof bolts, etc., that the Diamond Crystal mine did, he had no roof control problems. He also made the point that he had no oil or gas problems in his mine, which, of course, adds weight to the defendants' testimony that they were suspicious only of areas where oil and gas were present.
The basic question to be answered is whether the accident was foreseeable. The jury, who saw and heard each of the witnesses, evidently concluded that it was not. The verdict of the jury may be overturned in this court only if we find that it is manifestly erroneous. We have carefully scrutinized this voluminous, 2400 page record, and have found no error which under the above referred to principle of appellate review would allow a reversal. Accordingly we affirm the judgment of the district court at the costs of plaintiffs-appellants.
Affirmed.