321 So.2d 844 (1975)
Margot R. LEA, Individually, and as tutrix of the minors Robyn Lea and Reid Lea
v.
BAUMANN SURGICAL SUPPLIES INC. et al.
No. 10331.
Court of Appeal of Louisiana, First Circuit.
September 2, 1975.
Rehearing Denied November 24, 1975.
Writs Refused January 16, 1976.
*847 Neil H. Mixon, Jr., Baton Rouge, for Margot R. Lea.
Walker P. Macmurdo, Baton Rouge, for Newark Ins. Co.
Warren L. Mengis, Baton Rouge, for Baumann Surgical Supplies, Inc.
W. Malcolm Stevenson, New Orleans, for La. Power & Light Co.
Before LANDRY, BLANCHE and YELVERTON, JJ.
LANDRY, Judge.
Multiple appeals have been taken by the parties in this wrongful death action. The suit is by Mrs. Margot R. Lea, individually, and on behalf of her minor children, Robyn Lea and Reid Lea, for the death of W. K. Lea (Decedent), husband of Mrs. Lea and father of said minors. Decedent was killed August 2, 1972, in the crash of a privately owned 1968 Model Cessna 150, single engine airplane, which craft was attempting a straight entry landing approach at a privately owned 2500 foot grass air strip situated in a sugar cane field belonging to Cora Texas Manufacturing Company (Cora), and located near White Castle, Iberville Parish. The accident occurred at approximately 5:45 P.M. during clear weather. Decedent was a passenger in the plane which struck the static (shield) wire of a 230 KV (high voltage) electrical transmission line owned and operated by Louisiana Power and Light Company (LP&ampl). The plane, piloted by Decedent's close friend, Robert Clement, crashed to the ground after striking the wire. Both Decedent and Clement were killed instantly.
At the time of the accident, Clement, a recently licensed pilot, was employed by Baumann Surgical Supplies, Inc. (Baumann), as Sales Manager. Besides the occupants, the plane contained an EKG machine and a pair of crutches which Clement was delivering to a hospital owned by Dr. Cherie Major and situated at White Castle, approximately five miles from Cora airstrip.
The plane was owned by Clement, Leatus Still and Thomas H. Morrell, and was insured by Newark Insurance Company (Newark).
LP&L, Baumann and Newark are made defendants herein. Plaintiff alleges LP&L is liable for Decedent's death due to the negligent construction of the transmission line in the vicinity of the airstrip, which facility allegedly constitutes a hazard to air navigation. LP&L is also charged with negligence in failing to properly mark the wires and supporting structures with markers, lights or other warning devices allegedly required by Federal regulatory authority.
Baumann's liability is based on the claim that Clement, acting within the scope and during the course of his employment by Baumann, was grossly negligent in making a straight approach landing to the airstrip from the north, knowing of the line's presence, instead of using a standard approved entry pattern and landing at the south end of the field; failing to see the wire; failing to keep his plane under control and maintain a proper lookout; failing to avoid the wire of which he was aware, and *848 flying below the tops of the clearly visible transmission line poles in violation of basic aviation safety rules and instructions governing safe flight.
Newark is made defendant on the ground that a policy which it issued covering subject aircraft, and which was in force on the date of the accident, provides coverage for physical injury to or death of passengers resulting from pilot error or negligence.
LP&L defends on the grounds that the regulations sought to be invoked by plaintiffs are inapplicable because subject airstrip is not a public airport. Alternatively, LP&L urges that if the regulations are applicable, the facilities in question do not constitute a hazard to air navigation. LP&L also contends it was not at fault either in constructing the line near the airstrip or in failing to mark the poles and lines, or in any other respect whatsoever. Lastly, LP&L contends the sole proximate cause of the accident was Clement's negligence in the respects asserted by plaintiffs.
Baumann denies that Clement was negligent in any manner, and asserts that LP&L was the sole defendant at fault. Baumann also maintains that Clement was not acting within the scope and during the course of his employment in making the fatal flight. Rather, Baumann asserts, Clement was on a purely personal mission of flying for pleasure, and that his delivering of equipment to Dr. Major was a purely incidental undertaking.
Newark moved for summary judgment on the ground that its policy covered only physical damage to the plane, property damage with regard to the claims of third persons, and personal injury or death claims of non-passengers, and expressly excluded coverage of personal injury and death claims of passengers due to pilot error or negligence. In defense of the merits, Newark reasserts its position of lack of coverage, contends Clement was free of fault, and asserts that LP&L was the sole negligent defendant.
The case was tried before a jury which rendered a verdict in favor of plaintiff, Margot R. Lea, individually, in the sum of $275,000.00, and as tutrix of her minor children in the amount of $75,000.00, against defendants, Baumann and Newark. In rendering its verdict, the jury also made the following findings of specific facts: Clement was piloting the plane at the time of the crash; Clement was acting within the scope and during the course of his employment by Baumann; Clement was guilty of negligence constituting a proximate cause of the accident; Newark's policy covered passenger injury resulting from pilot error or negligence; LP&L was guilty of negligence (the nature of which is not stated), but that said negligence was not a proximate cause of the accident; Lea was not piloting the plane, neither was he guilty of contributory negligence or assumption of risk.
Plaintiff has appealed complaining primarily of LP&L's release from liability despite the jury finding said defendant guilty of negligence. Additionally, plaintiff urges trial court error in: (1) refusing to admit in evidence photographs of certain aviation orange spherical marking devices which plaintiff contends should have been used to mark the transmission lines in question; (2) refusing to permit cross examination by plaintiff of an LP&L employee to establish that LP&L had taken no steps and made no effort to mark the lines or otherwise alleviate the alleged hazardous condition since the accident, and (3) failure to give the jury certain requested special charges.
Baumann has appealed alleging the jury erred in finding Clement guilty of negligence, and finding that Clement was acting within the scope and during the course of his employment at the time of the crash. Baumann also complains that the trial court erroneously charged the jury concerning *849 the test of an employer's liability for the acts of his employees, and also in refusing its special charge that because of the instinct for self-preservation, it must be presumed Clement was exercising ordinary care and did not seek to expose himself to unnecessary risk of harm.
Newark has appealed asserting error in the denial of its motion for summary judgment. Newark joins Baumann in urging that Clement was erroneously found to be negligent, and unites with plaintiff in contending that LP&L alone should have been cast in judgment. Newark also urges trial court error in admitting certain correspondence between its local agent and owners of the airplane concerning coverage of Newark's policy, which correspondence formed no part of the insurance policy. Most importantly, Newark contends the jury erred in finding passenger bodily injury and death coverage under its policy. Additionally, Newark maintains the lower court erred in refusing its requested special charge that because of the instinct for self-preservation, it must be presumed Clement was exercising due care, and did not seek to expose himself to unnecessary risk, even though the trial court gave a similar charge regarding decedent, Lea, guest passenger.
We affirm the judgment finding Clement guilty of negligence constituting a proximate cause of the accident. We affirm LP&L's release from liability, and reverse the judgment holding LP&L to be negligent. We reverse the judgment decreeing passenger injury coverage under Newark's policy. We affirm Baumann's liability for the negligence of Clement.

UNCONTROVERTED PERTINENT FACTS
In August, 1951, LP&L acquired from Cora a 100 foot wide servitude for construction of a 115 KV transmission line, and shortly thereafter erected the facility. Between 1960 and 1963, Cora cleared a 2500 foot strip in its cane fields and converted same into a grass landing strip to accommodate crop dusting aircraft utilized in Cora's extensive sugar cane operation. After construction of the strip, Cora, through its President, gave permission to Dr. Cherie Major to use the strip, Dr. Major being the owner of a small airplane. Dr. Major constructed a metal building adjacent to the airstrip to serve as a hangar for his plane. At Dr. Major's expense, electrical power was furnished to the hangar by LP&L. The record shows that numerous meter readers and service personel of LP&L, including the local service manager, were aware of the airstrip's presence from the time of construction of the hangar to the date of the accident, a period of several years. It is also conclusively shown that none of LP&L's executive personnel were aware of the strip's existence as of the date of the accident. In 1969, LP&L acquired from Cora an additional 60 feet of right of way abutting the original servitude, this latter acquisition being for the erection of a 230 KV transmission line, which facility was completed in 1969. No notice of the proposed construction was given the Federal Aviation Authority (FAA), neither was the FAA furnished plans for approval prior to erection of the line.
It is stipulated that the transmission line is situated 1,191 feet north of the north end of the airstrip. The static non-conductor top wire and two conductor wires strung beneath are strung between poles, the tallest of which are 98.6 feet high. It is also stipulated that the wire span involved is 309 feet; that the static wire is strung from the tops of the poles; that at the lowest point of the span involved, the static wire is 67 feet above the ground, and the lower conductor wires are 55.1 and 42.5 feet, respectively, above the ground, and that at the point of impact, the static wire is 74 feet above ground level. The static wire is three-eighths (3/8)" inches in diameter, and serves only as a lightning arrestor to protect the two one and one-quarter (1¼)" inch conductor wires strung beneath.
*850 Present FAA regulations do not prohibit a straight traffic pattern approach to an airfield. Regulation 9189 does require that all turns of aircraft be made to the left. However, it is accepted standard procedure, universally taught by instructors, that a standard traffic pattern entry be followed in every landing in the interest of uniformity and air safety. A standard traffic pattern entry involves basically a series of left turns depending upon whether the pilot elects a full or partial entry pattern. A full traffic pattern entry involves circling the field before landing, which procedure affords the pilot opportunity to survey the field and runway for obstacles or runway defects or any other unusual condition he may encounter. To land at Cora from the north, a poilot approaching from that direction and making a full traffic pattern entry would fly along and parallel to the western side of the strip (upwind) to the south end of the field and turn left (crosswind). He would then proceed along the eastern side of the field (downwind) to the north end of the field and turn left (base). The pilot would then line up his plane with the center of the runway and fly into the strip for landing. A pilot approaching from the north and desiring to land at the south end of the strip, after making a partial traffic pattern entry, would simply parallel the western extremity of the field to its south end where he would turn left and land. At the time of trial, the FAA had in circulation a bulletin informing pilots of FAA intent to adopt a rule prohibiting straight entry pattern landing at uncontrolled airports. The bulletin requested comment and reaction to the proposal before FAA action thereon.
It is undisputed that standard flying practices and instructions advocate and teach entry into the initial or upwind leg of a full traffic pattern entry at an altitude of 800 to 1,000 feet. In making his crosswind turn and downwind leg, a pilot is taught to reduce altitude to the point where, after making his final or base turn, he has attained an altitude of approximately 400 feet, at which time he should be approximately 2,000 feet from the end of the runway. At 1,200 feet from the runway end, a pilot should be between 250 and 400 feet above ground level.
The experts unanimously agree that at least a partial traffic pattern entry should be made in every instance, in the interest of safety of all craft in the area of an airport. The experts also agree that while there is no express FAA regulation prohibiting flying below the tops of visible transmission towers or poles, it is universally taught, as part of basic flying training and instruction, that it is extremely bad practice and inherently dangerous to fly below the tops of such structures. It is also conceded that universal training practices teach that it must be assumed wires are strung between such facilities, and that such sires are difficult to detect in flight.
Clement was making a straight entry approach from the north. This means he simply flew in from that direction, descended without making any turns whatsoever, and headed directly toward the north end of the strip for a landing.
The accident was witnessed by Eugene Major, 20 year old son of Doctors Cherie and Connie Major. Young Major had been sent to the airstrip by his mother, Dr. Connie Major, to meet Clement. The Major lad had about 60 hours flying experience, but was not a licensed pilot. He had previously flown with Clement who had landed at Cora from the north after flying above subject line. Major heard the plane approaching, and first saw the aircraft a second or two before it struck the line. He noted that the plane was making an excellent level approach but, in his judgment, was flying too low. He stated that the plane came down in somersaulting motion after striking the wire. His testimony leaves little doubt but that Clement was making a straight traffic pattern entry into the airstrip from the north.
*851 Cora strip was not open to the public. It was not listed on any published airport directory. Clement had no permission, either express or implied, from Cora to use the facility. The strip is surrounded by sugar cane fields. Its sole building facility consisted of a small hangar in which Dr. Cherie Major kept his private plane with Cora's knowledge and consent. The field also had a wind sock to indicate wind direction.

THE PILOT AND ALLEGED PILOT NEGLIGENCE
Investigation disclosed the impossibility of factually determining whether Clement or Decedent was piloting the plane. It is not seriously disputed, however, that Clement was actually at the control of the two-seater plane when it crashed. Clement was the only licensed pilot aboard. Decedent had no pilot training whatsoever, and his flying experience was apparently limited to flights as Clement's guest. The jury concluded Clement was the pilot. We deem this finding eminently correct under the circumstances.
The poles on the transmission line were clearly visible to a pilot entering the area of the strip from the north. When Clement approached the strip, the weather was clear and there was no obstruction of his visibility. Clement was familiar with the existing conditions. He had landed at Cora at least twice before. Besides having flown Eugene Major, Clement had, on at least one other occasion, flown his co-owner, Morrell, who was also a pilot, to Cora while making a delivery to Dr. Major's clinic. Clement is charged with knowledge of the line.
We find Clement was negligent in violating the elementary rule of flight that a pilot should never fly below the tops of visible transmission line poles or towers. We also note that Clement's piloting inexperience was manifest in flying too low, namely, in that he was only 74 feet above ground level while still approximately 1200 feet from the end of the runway. The expert testimony shows that at such a low altitude, he was too low to glide into a landing in the event of a power failure. At this crucial point, Clement should have been between 250 and 400 feet above ground level to comply with accepted landing procedure. As did the jury, we find that Clement's negligence was a proximate cause of the accident.
LP&L'S ALLEGED NEGLIGENCE IN ERECTING THE LINE IN THE VICINITY OF THE AIRSTRIP AND FAILING TO MARK THE STATIC LINE AND POLES.
Part 77 of the FAA regulations prescribe a complex set of criteria for determining whether structures are considered obstructions to air navigation, and, if so, whether a hazard to air navigation results therefrom. The criteria differ to cover varying circumstances obtaining at diverse airports. The criteria range from those required to protect traffic at airports where instrument controlled landings are made at low level flight, to those governing airports where planes cannot land except when visibility is at least three miles. The standards are established in terms of imaginary planes of flight which are projected into space, both vertically and laterally, commencing from the end of the airport runway at prescribed angles and for designated distances. Any structure which enters or penetrates the flight plane thus established is deemed an obstruction to air navigation. Anyone proposing erection of a facility which enters or penetrates such a flight plane at a public airport must submit detailed plans and specifications for the proposed work and obtain FAA approval thereof. Part 77 does not apply to private airports and is inapplicable to the Cora strip. At public airports, provided with instrument control facilities for low level entry, the flight plane in which penetration is deemed an obstruction is fixed on a 20 to 1 ratio, meaning that the plane extends and *852 projects 1 foot vertically above ground level for each 20 linear feet of space, commencing at the end of the runway.
Assuming Part 77 applied in this case, the static line would constitute an obstruction to air navigation if, at any point within the therein prescribed flight plane, the line was more than 60 feet above the ground. Applying this formula, the line would be an obstruction to air navigation because it penetrates the flight plane by 7 feet at mid-span and by 14 feet at the point of impact.
Plaintiff and Newark contend that the static wire constitutes an obstruction to air navigation inviolation of Part 77, and that LP&L was negligent in erecting the facility with knowledge of the airstrip's presence in the vicinity without FAA approval. Considerable testimony was adduced by cross examination of LP&L employees to establish LP&L's knowledge of the field's existence before the 230 KV line was built. It sufficies to note that numerous LP&L installation, maintenance and service personnel, including meter readers and local Service Manager, Joseph Brou, were aware that electrical service was furnished Dr. Major's hangar commencing February 5, 1963. LP&L produced numerous executives, including George Marse, Land Agent, Charles K. Ohlmeyer, Service Superintendent, and Raymond Meyer, Chief Engineer, all of whom denied knowledge of the strip's existence when subject line was constructed. We find the knowledge of LP&L's employees is attributable to the corporation, and LP&L must therefore be charged with knowledge of the airstrip's existence when the line was constructed in 1969.
Plaintiff's chief expert, Frank McDermott, Air Consultant, with 14 years of executive service with FAA from 1946 to 1960, testified that, in his opinion, the static line was an obstruction and hazard to air navigation because of its penetration of the mentioned flight plane. Mr. McDermott, conceded, however, that FAA Part 77 was inapplicable because Cora is a private airstrip. Mr. McDermott was also of the opinion that the proposed facility should have nevertheless been submitted to FAA for approval and that, in his opinion, its construction would have been prohibited. He was of the view that FAA will make recommendations, upon request, even with regard to private airports.
LP&L's expert, Joseph Vivari, Air Consultant, former FAA employee, with 9 years service in charge of the office responsible for administration of FAA Part 77, testified that the line in question did not violate FAA regulations. He stated Part 77 does not apply to Cora because Cora is a private facility. From personal knowledge gained from his official FAA capacity, he stated that it is FAA policy to ignore requests for recommendations and approval concerning structures which affect air travel at private airports. Vivari is of the opinion that LP&L's line is neither an obstruction nor hazard to air navigation because it is not dangerous to any aircraft flying a pattern compatible with safe flying practices and procedure. While McDermott disagrees and maintains that the line is a hazard, nevertheless McDermott admits that a pilot flying a normal approach pattern would pass over the line. The gist of McDermott's testimony, as well as that of plaintiff's other experts, Doug Stracener, Commercial Pilot, and Edward Duffard, Flying Instructor, is that LP&L was negligent in constructing the line to a height which would penetrate the above mentioned flight plane, because some pilots, contrary to basic flight instruction, will fly below the tops of visible transmission line poles and towers.
Relying on authorities from other jurisdictions, principally Yoffee v. Pennsylvania Power and Light Company, 385 Pa. 520, 123 A.2d 636, plaintiff contends the law does not permit anyone to install structures which, to his knowledge, will pull airplanes down from the sky.
*853 We have no quarrel with the basic rule pronounced in Yoffee, above. However, we note Yoffee is clearly distinguishable from the case at hand. In Yoffee a pilot struck a wire strung from 40 foot towers over a mile apart, in open country, on hills located on either side of half mile wide Berry Mountain Gap of the Susquehanna River, approximately one mile south of Millersburg, Pennsylvania. The hill on the east side of the river is 680 feet high, and the one on the west side 657 feet high.
Plaintiff offered considerable expert testimony concerning the added conspicuity of transmission line wires obtainable by attachment of twenty inch diameter, aviation orange colored spheres to such wires at intervals varying from 25 to 150 feet. Plaintiff maintains that had such warning devices been attached to the static line, in compliance with FAA Circulars AC 70/7460-1, dated February, 1968, AC 70/7460-1a, effective January, 1972, and AC 70/7460-1b, which postdates the accident, Clement would have been able to see the line in time to avoid the accident. There is marked disagreement between McDermott and Vivari as to whether these directives require installation of markers on LP&L's line. McDermott expressed the view that such markers are required on all lines save those between poles or towers lighted by strobe devices described therein. Since LP&L's poles are not so lighted, McDermott believes the marker spheres are required.
Vivari, however, contends the cited regulations do not require the use of marker spheres. Additionally, Vivari contended that any such requirement, if it existed, was eliminated by an FAA revised standard issued February 1, 1971.
Plaintiff produced Leatus Still, Commercial Photographer, who made moving pictures of 20 inch, aviation orange spheres installed at the Willow Glenn Mississippi River Crossing. The movies were taken from a flying aircraft, utilizing a camera equipped with a zoom lens, at a distance of 200 to 300 feet from the line. The pictures reveal the spheres are somewhat difficult to spot. Still's testimony indicates these spheres tend to darken in time from solar effects.
Plaintiff's expert, Stracener, was of the view that a pilot could see the static line in time to avoid an accident if the lines were properly marked. He also considered the absence of markers to be a contributing cause of the accident. The movies were shown in Stracener's presence. On cross examination, Stracener was shown a 20 inch sphere and asked if the spheres depicted in Still's movies were the same size as those shown him. Stracener replied he understood the spheres shown in the movies were of cast iron and from 8 to 10 inches in diameter. This line of examination was obviously intended to offset the effect of Stracener's testimony which stated that the spheres shown in Still's movies were difficult to detect.
Edward Duffard, Flying Instructor, called by plaintiff, attested to having made numerous simulated landings at Cora to determine visibility of the lines at various stages of a standard entry approach pattern. He conceded the poles can be easily seen by a pilot approaching from the north, and that the larger conductor lines can be seen at a greater distance than can the smaller static line. Despite knowing the static line was there and looking intently for it, he could not see the top line until he was right upon it. Duffard was of the opinion that use of 20 inch markers would greatly improve visibility of the line, and would have enabled Clement to see the line in time to avoid the accident. Duffard was shown photographs taken by Ronald Dillon, Commercial Photographer, depicting aviation orange sphere markers on lines. The photos, not then offered in evidence by plaintiff, were of a marked line situated near an airstrip located near Briarwood Golf Club in East Baton Rouge Parish.
*854 Plaintiff next offered the testimony of Dr. Leonard Adams, Electrical Engineer, who testified concerning the conspicuity of aviation orange sphere markers. He stated that the spheres markedly increased conspicuity, and testified to having flown over the line adjacent to Briarwood Club. He noted that the aviation orange spheres installed there were visible from a considerable distance.
Mr. McDermott, testifying for plaintiff, stated that presence of the markers on the line would have alerted Clement to the presence of the shield wire. In effect, he stated that markers would have increased conspicuity to the extent Clement would have observed the markers and avoided collision with the line.
LP&L offered the testimony of Vivari who deposed to having considerable experience dealing with markets while employed by the FAA, and also in his capacity as consultant after leaving the FAA in 1972. He stated, in effect, that experiments show aviation orange spheres are difficult to apot in flight. He was of the opinion that at most these devices can be detected no more than 1,000 feet distant, which is insufficient time for a pilot to take evasive action. He stated FAA regulations require markers visible from 4,000 feet. He also noted that even if a pilot is aware of a line which is marked, the line cannot be seen in time to take evasive action by a plane flying approximately 85 miles per hour, the speed at which Clement should have been flying at the time he approached the field for landing.
After close of defense testimony, plaintiff offered in rebuttal six still photographs taken by Dillon at the airstrip near Briarwood Golf Club. Upon defense objection, the photographs were rejected as improper rebuttal. Plaintiff proffered the photographs and urged that they were improperly rejected, and denial of jury access to the photos is reversible error. We shall hereafter deal with this issue separately.
Plaintiff contends the jury erred in finding that LP&L's negligence was not a proximate cause of the accident. Relying upon Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298, plaintiff maintains the line was a cause in fact of the accident in that the accident would not have happened had the line not been present. Plaintiff asserts that the jury having found LP&L to be negligent, and the facts showing that the line was a cause in fact of the accident, application of the principle in Dixie, above, required a finding of liability on the part of LP&L. In support of its position, plaintiff cites numerous cases which have applied the Dixie, above, principle.
We disagree with plaintiff's contention. We find that the jury manifestly erred in holding LP&L guilty of negligence because such a conclusion is totally insupportable on the record. It is elementary tort law that negligence is the breach of a duty of care owed the injured party. If there is no duty to exercise care as to a given plaintiff, defendant's conduct does not amount to negligence and is not actionable. Neither Dixie, above, nor any of its progeny, purport to overrule this basic long standing principle of tort law. Dixie established a three step test for determination of what amounts to proximate cause which has historically and traditionally been required to impose tort liability. The first inquiry is whether the conduct complained of is a cause in fact of the harm. Secondly, it must be determined whether defendant was under a legal duty imposed to protect against the particular risk involved. The final question is whether defendant breached a duty imposed. Dixie dealt with alleged violation of a specific statute imposing a duty of care.
Applying Dixie to the present case, we find that the presence of the wire was a cause in fact of the accident, inasmuch as the accident most certainly would not have occurred had the wire not existed. We *855 find this circumstance the sole aspect of the Dixie formula present in the case at hand.
We do not interpret Dixie to be applicable only to statutory violations imposing a duty of care. We are of the view that Dixie applies in any tort action, including one in which the duty of care is imposed by the general tort rule that negligence is the failure to exercise that degree of care and caution which the law demands of a reasonably prudent person under similar circumstances.
Notwithstanding the erection of the wire by LP&L was a cause in fact of the accident, liability does not attach upon LP&L herein for the simple reason there was no duty, statutory or otherwise, resting upon LP&L with respect to either erecting or marking the line. LP&L cannot be negligent in failing to discharge a duty of care which did not exist. FAA regulation 77 does not prohibit erection of the line in question because Cora airstrip was a private facility. Neither does failure to mark the line constitute violation of an FAA regulation inasmuch as we understand these regulations to require marking only of such facilities as constitute a hazard to navigation. We do not believe it could be argued logically that every transmission line, regardless of height and location must be marked, under penalty of liability for all ensuing air accidents. Such a rule, we believe, would be basically nonsensical.
Our appreciation of the record impels the inescapable conclusion that erection of this facility did not constitute a hazard to air navigation, albeit the poles and wire extended a maximum of 98.6 and a minimum of 67 feet above the earth at the span in question. As thus constructed, the wire did not constitute a hazard to any pilot landing at Cora airstrip pursuant to a normal flight pattern and observing basic rules of air safety.
No instrument landing could be made at Cora. There was no reason for Clement to be flying an instrument glide slope pattern in making a landing in this case. Moreover, Clement was landing at a private field without permission of the owner. Additionally, he must be charged with knowledge of the line under the circumstances. Standard flying procedure dictated that the plane pass over the wire at a minimum altitude of 250 feet, well clear of the structure. We do not deem it negligence to fail to foresee that a pilot will attempt a landing in violation of fundamental principles of safe flying. We find the same reasoning applies with respect to LP&L's failure to mark the line. Since the line was not a hazard to air navigation, we do not deem it negligence to fail to mark its existence.
Mills v. Orcas Power & Light Company, 56 Wash.2d 807, 355 P.2d 781, relied upon by plaintiff, is factually inapposite. In Mills, the accident occurred at a public airport. The plane involved, flying a normal pattern, struck a utility wire thirty feet in height and situated on the south side of an east-west highway whose northern shoulder was 100 feet south of the south end of the runway. In landing, the wheels of the plane encountered the wire.
We conclude the jury manifestly erred in finding LP&L negligent in this instance, and reverse its determination in this regard.

EXCLUSION OF PLAINTIFF'S REBUTTAL PHOTOGRAPHS
Six photographs taken by Dillon of the power line situated near Briarwood Golf Club, and showing installation of 20 inch aviation orange marker spheres, were not offered by plaintiff in presentation of its case in chief, notwithstanding Dillon was called by plaintiff in chief. After close of the defense, plaintiff recalled Dillon to identify the photos preparatory to introducing them in evidence. The pictures *856 were excluded upon LP&L's objection they do not constitute rebuttal, but are merely cumulative evidence concerning visibility of such markers, which evidence should have been presented in chief. The trial court sustained the objection. The photographs appear as a proffer.
Defendants contend the photographs were properly excluded because they could and should have been presented in chief in that plaintiff raised the issue of conspicuity of lines provided by such markers. Defendants also contend that the photographs were not in rebuttal of defendant's evidence, but of plaintiff's own evidence in chief given by Still, who testified that the movies he took of the Willow Glenn facility, which had similar markers, showed such markers to be merely black dots.
Among other reasons for rejecting the proffered photographs, the trial court noted that to introduce the photographs upon rebuttal would be prejudicial to LP&L because that defendant had no opportunity to investigate at that point, and also because the issue of markers had been a salient issue in the case from the inception.
We deem it elementary that there is a measure of discretion vested in a trial court in the matter of admission of rebuttal evidence. We find the proffered evidence to be principally cumulative, and that its prime purpose would have been to add weight to plaintiff's presentation of the issue of visibility resulting from the presence of markers. Under the circumstances, we find the trial court properly rejected this evidence on rebuttal. Johnson v. Nora, La.App., 87 So.2d 757.
THE TRIAL COURT'S REFUSAL TO PERMIT NEWARK AND PLAINTIFF TO CROSS EXAMINE LP&L'S EMPLOYEE, RAYMOND MEYER.
Newark called Raymond Meyer, Vice President and Chief Engineer, LP&L, upon cross examination and attempted to elicit trestimony to the effect that no corrective measures had been taken by LP &L to mark the line or otherwise correct or alleviate the allegedy dangerous condition since the occurrence of subject accident. The evidence was excluded on LP &L's objection thereto on the ground that evidence of corrective measures taken following an accident is inadmissible. Newark, joined by plaintiff, proffered Meyer's testimony on this issue.
Conceding that evidence of post accident corrective measures to rectify a condition involved in an accident is not admissible, the proponents argue evidence of such failure should have gone to the jury in this instance. It is argued the jury was entitled to know whether LP&L had given any consideration to corrective measures after its executive personnel became aware of the presence of the airstrip.
We find the position of proponents without basis. It is well settled that evidence of changes, repairs, or corrective measures taken subsequent to an accident, for the purpose of preventing a similar recurrence, is inadmissible to show negligence or establish an admission of fault. Givens v. De Soto Building Co., 156 La. 377, 100 So. 534; Jrahan v. Liberty Mutual Insurance Company, La.App., 273 So.2d 331.
The reason for the above rule is the sound principle that persons should be encouraged to repair or correct conditions which are involved in accidents, and not be deterred therefrom by a policy which makes such actions an admission of prior fault or negligence. The proffered testimony was clearly inadmissible, and properly rejected by the trial court. Admission of such evidence could only have served to prejudice the cause of LP&L by portrarying said defendant to the jury as a callous wrongdoer unconcerned with the effect of its misconduct upon the rights of others.

*857 FAILURE TO GIVE PLAINTIFF'S REQUESTED SPECIAL INSTRUCTIONS
Plaintiff requested 29 special charges be given the jury. Of these charges two (2), four (4), eight (8), nine (9), twelve (12), thirteen (13) and fourteen (14) dealt with causation, and charge twenty-nine (29) regarded the adverse presumption resulting from a party's failure to call a witness who possessions significant knowledge as to a material issue involved. After rendition of his charge to the jury, the trial court then announced it would entertain objections which any party might have to the court's refusal to grant special charges requested. The following colloquy between the court and counsel for plaintiff appears of record:
"THE COURT: Okay, Mr. Mixon, I'll let you go first. Do you want to object to all the charges not given?
MR. MIXON: Yes, sir.
THE COURT: Okay, Mr. Mengis?"
The record contains no further discussion of the matter by counsel for plaintiff who made no objection to the general charge given. The right of a party to assign as error, on appeal, the failure of the trial court to grant requested instructions, is controlled by LSA-C.C.P. art. 1793, which pertinently provides as follows:
"Art. 1793:
* * * * * *
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."
The foregoing codal provision is clear and unambiguous. It establishes a procedural rule which, by its terms, is mandatory if a litigant desires to preserve the right to appellate review of denial of a requested jury charge. The statute requires that the litigant must not only object to each special charge which is refused, but must also state the grounds for each such objection. The purpose of the requirement that the grounds for each objection be stated is obviously to afford the trial court opportunity to reweigh its refusal in the light of the merits, if any, of the grounds advanced by counsel making the objection. In this instance, counsel for plaintiff simply made a blanket objection to the trial court's refusal to give all requested special charges denied without assigning any reasons whatsoever. This does not comply with the applicable statute. Failure in this regard forfeits the right to complain on appeal of injury resultant therefrom, if any. Gryder v. Travelers Insurance Company, La.App., 193 So.2d 532, and authorities therein cited. Under the circumstances, we are without authority to consider plaintiff's contention that the trial court erred in declining to give the mentioned requested special instructions.

NEWARK'S DEFENSE OF LACK OF COVERAGE
Effective November 4, 1971, Newark, through its local agent, Larry Fourrier Insurance Agency, Inc. (Fourrier), insured subject plane for its then owner, Steve Welch. By written application, Welch requested hull coverage (physical damage to the plane itself), bodily injury coverage, excluding passengers, in the amount of $100,000 for each person and $300,000 for each occurrence, and property damage liability in the sum of $100,000 for each occurrence. The transaction was handled by Steve Fourrier, son of Larry Fourrier. Neither Fourrier nor any of its employees possessed authority to bind or write aircraft coverage policies or to determine the types of coverages Newark would issue on aircraft or the premiums charged therefor. The transaction was Steve Fourrier's first experience in this field. When approached by Welch, Mr. Fourrier called Newark's *858 Dallas, Texas office and was sent an application form and pilot qualification form. On November 8, 1971, Newark wrote Steve Fourrier a memorandum binding coverage on the plane and fixing a premium of $183.00 for hull coverage in the sum of $5,800.00, with a deductible of $500.00, and bodily injury of $100,000-$300,000, excluding passengers, and $100,000 property damage coverage for a premium of $56.00, or a total premium of $239.00. Although Welch was primarily concerned with hull coverage of the plane, which was mortgaged to a local bank, and despite his application did not request coverage of passenger bodily injury, Newark issued the policy with the coverage portion thereof filled in as follows:

From the above, it is apparent that the $100,000 property damage coverage for which Welch applied, and which should have been indicated in II G, was instead indicated as Coverage G of Part II, but inadvertently inserted in the preceding bracket F, which is intended to list coverage for passenger bodily injury. Despite the foregoing, memoranda from Newark direct attention to the exclusion of passenger bodily injury coverage. Steve Fourrier sent the original policy to the mortgagee, and a copy to Welch. Welch's copy was accompanied by a cover letter, dated December 31, 1971, stating the hull coverage was subject to a $500.00 deductible clause, and that liability coverage was $100,000 for bodily injury to each person and $300,000 for each occurrence, on persons other than passengers, and $100,000 passenger bodily injury coverage for each occurrence. Subsequently, the plane was acquired by Mr. and Mrs. Robert St. Romain, Jr. and Clement. Mrs. St. Romain advised Fourrier that the new owners desired the same coverage carried by Welch. Required pilot information forms were filled out by the new owners in pursuance of which Newark issued and endorsement, effective May 16, 1972, changing the name of the insured from Welch to the St. Romains and Clement. Otherwise the policy remained the same as when originally issued. On June 23, 1972, Steve Fourrier wrote the St. Romains and Clement a letter stating that the enclosed policy provided $5,800.00 coverage of the aircraft with $500.00 deductible; liability coverage of $100,000 for each person (excluding passengers), with a limit of $300,000 for each occurrence, and $100,000 bodily injury to passengers. The letter also notes that the former owner, Welch, elected to exclude property damage liability coverage, and that if the new owners wished such coverage, a rate would be quoted for the premium. It is obvious that the letter was in error because Welch had in fact requested property damage liability coverage of $100,000. It appears that the improper insertion of Coverage G, by Newark, into bracket F, the passenger bodily injury coverage bracket, is the cause of the error made in the letter of transmittal.
*859 Shortly before the accident, the policy was again endorsed to substitute Leatus Still and Thomas H. Morrell as co-owners with Clement, in lieu of Mr. and Mrs. St. Romain. The transmittal letter of June 23, 1972, states that a total premium of $186.00 is charged for the coverage written, representing an increase of $69.00 due to the low pilot hours experience shown on the forms filled out by the new owners. No cover letter was sent when the endorsement was made showing Still and Morrell as owners.
Morrell testified frankly that he never thought he had coverage of passenger bodily injury claims. He conceded he was primarily concerned with hull coverage because the plane was mortgaged, and his only interest was in seeing that the bank was paid in the event of damage to the plane.
Newark's contention of lack of passenger bodily injury coverage is predicated on LSA-R.S. 22:628, which provides:
"No agreement in conflict with, modifying or extending the coverage of any contract of insurance shall be valid unless in writing and made part of the policy."
Newark contends that the agent's letters informing the insureds that passenger bodily injury coverage in the sum of $100,000 was provided are of no moment because they were not attached to and made part of the policy as required by LSA-R.S. 22:628. Newark points out that no application requested the coverage now being asserted; that premiums charged did not include such coverage; that no premiums for such coverage were in fact paid, and that the placement of the requested property damage liability coverage in paragraph F of Coverage II, instead of under paragraph G was purely a clerical error.
In addition to the statute, Newark relies upon Jones v. Breaux, La., 289 So.2d 110, which held that the provisions of an automobile rental agreement, not made part of the policy insuring the vehicle, could not limit policy coverage.
Insofar as the letters are concerned, LSA-R.S. 22:628 and Jones, above, are clearly applicable. These communications, not attached to and made part of the policy, cannot extend coverage thereunder.
Plaintiff, however, invokes the well recognized rule that ambiguous provisions of an insurance policy are construed against the insurer. On this basis, plaintiff and Baumann urge that as prepared by Newark, the coverage provision of the policy is confusing, as evidenced by the fact that the local agent itself was misled as to coverage by the manner in which the coverage categories were indicated.
The authorities upon which plaintiff and Baumann rely, namely, Corporation of Roman Catholic Church of Eunice v. Royal Insurance Company, 158 La. 601, 104 So. 383; Lea v. St. Paul Fire and Marine Insurance Co., La., 306 So.2d 740; Jennings v. Louisiana & Southern Insurance Company, La.App., 280 So.2d 281; Monroe Air Park No. 1 v. American Aviation & General Insurance Company, La.App., 41 So.2d 795; and Urania Lumber Company v. Insurance Company of North America, La. App., 177 So.2d 640, are all factually distinguishable and not decisive in this instance.
For example, Lea v. St. Paul, above, involved a claim for death benefits under a life policy which provided coverage dependent upon decedent's activity at the time of death. Monroe Air Park No. 1, above, was concerned with an agent's acceptance of premiums on a policy after transfer of the insured aircraft to a new owner. The agent was authorized to write such policies, but had no authority to write policies on a transferred craft without written permission of the insurer. It was *860 held in this instance that the agent's knowledge was that of the insurer and having accepted the premium, the insurance was binding. In Urania Lumber Company, above, the insured sued on a fire policy containing a distribution clause, which, if applicable, rendered insurer liable for $49,000 of insured's loss. The insured contended the clause was inserted in the policy through error, and asked for reformation of the instrument to delete the clause, which deletion would render insurer liable for an additional $12,000.00. The issue was whether the policy should be so reformed. It suffices to state the court found the clause was included through mutual error. The insured was granted recovery of the additional $12,000.00.
We think the question put is simply whether the coverage sought to be enforced is one which the insured desired, purchased and paid for, and should therefore be deemed included in the policy, and not whether a policy provision is so obscure or vague that its terms are difficult of application. No claim is made here that the insureds desired, applied for or paid for protection against claims for bodily injuries to passengers. The insurer's computation of premiums charged did not include a premium for such coverage. The $100,000 protection inserted in paragraph F of the coverage clause is preceded by the letter G which, in the same clause is shown to relate to property damage coverage, not coverage of passenger bodily injury claims. In this instance, there is no contention of mistake as to the coverage which the insured intended to purchase, and which the insurer proposed to underwrite. The error was not in failing to cover a desired risk, but in an erroneous designation of risks upon which insured and insurer were in complete agreement. Under the circumstances, we find the ambiguity rule inapplicable. We likewise find the jury manifestly erred in holding Newark's policy applicable to claims for bodily injuries to passengers. We reverse this finding.
BAUMANN'S CLAIM THAT THE JURY ERRED IN FINDING CLEMENT NEGLIGENT AND THAT THE TRIAL COURT ERRED IN GIVING THE GENERAL CHARGE ADMINISTERED AND IN FAILING TO GIVE CERTAIN REQUESTED SPECIAL INSTRUCTIONS.
We find no error in the jury conclusion that Clement was guilty of negligence constituting a proximate cause of the accident. We find this determination amply supported by the record. We find Clement was negligent in flying too low. His altitude of 74 feet, while still 1,200 feet from the end of the runway on which he proposed to land, was unsafe in that it would not permit a powerless glide landing in the event of a power failure. While the violation of this safety rule may not itself be regarded as a proximate cause of the accident, it emphasizes his piloting inexperience and lack of care and explains to some extent his negligent act which was a proximate cause of the accident, namely his violation of the basic rule of flight training and safety that a pilot must assume wires are strung between visible transmission poles, and that a pilot should never fly below the tops of such structures.
Baumann objected to the following charge given the jury concerning the liability of an employer for the acts of his employees:
"You are charged that a corporation can only act through its officers and employees. The negligence or fault of an officer or employee acting within the scope and during the course of his employment is considered to be the negligence of the corporation. The test of an employer's responsibility for the acts of his employees is not whether the act is done in accordance with the instructions of the employer to the employee but whether the act was done in the furtherance of the business of the employer and *861 is reasonably attributable to the performance of the duties which the employee was hired to do."
Baumann also objected to the trial court's refusal to grant its requested charge I, which states:
"In order to determine whether or not Baumann Surgical Supplies, Inc. is liable to plaintiff you must first decide:
(b) Was he (Clement) at the time acting within both the course and scope of his employment?
(c) Was he, at the time, under the control, both as to time and activity, of Baumann Surgical Supply, Inc.?
You are instructed that the words `course of' refers to the time and place of employment and the words `scope of' refers more to while being engaged in the functions for which employed."
We note that Baumann's reasons in support of its objections, while somewhat superficial and sketchy, nevertheless, meet the requirements of LSA-C.C.P. Art. 1793, and permit appellate review thereof.
We find that the charge given concerning the employer's liability for actions of employees, coupled with other portions of the charge, adequately charged the jury on this issue. Baumann complains principally of failure to give paragraph (c) of the requested instruction. Because of the nature of Clement's position and duties, we find no error in the Court's refusal to charge that Clement must have been under Baumann's control, both as to time and activity, in order for Baumann's liability to attach. Although the charge given may well have been amplified in this regard, we find no prejudicial error in the refusal to make the requested charge.
Relying upon Maas v. Harvey, 200 La. 736, 8 So.2d 683; Fox v. City of Syracuse, 231 App.Div. 273, 247 N.Y.S. 429, affd. 258 N.Y. 550, 180 N.E. 328; Graffagnini v. George Engine Company, Inc., La.App., 45 So.2d 412, and James v. J. S. Williams & Son, 177 La. 1033, 150 So. 9, Baumann contends Clement was not acting within the scope and during the course of his employment. It is argued that Clement was on a purely personal mission of flying for pleasure and that any business he may have been transacting on Baumann's behalf was incidental.
This appears to be a case of first impression involving an employee's use of an airplane in the alleged performance of his employment as a salesman. The record establishes that Clement was Baumann's Sales Manager. Clement had no regular working hours. He did not punch a time clock. He had, on former occasions, sold equipment to Dr. Major and had delivered same by car and at least once by plane. Clement's immediate superior, A. C. LeRoy, Baumann's Manager, was aware that Clement had a plane, but was not cognizant that Clement was using the craft in his sales work for Baumann. Clement was paid to use his own vehicle in his sales work. On the afternoon in question, Decedent came to Baumann's place of business sometime before 5:00 P.M., seeking Clement who was not then in. While waiting for Clement, Decedent chatted with LeRoy. Clement arrived sometime after 5:00 P.M., and went into his office which was adjacent to LeRoy's. Decedent remained in LeRoy's office and chatted with Clement through the open door to Clement's office. LeRoy testified that the friends spoke about flying, but did not expressly say they were going to fly that afternoon. LeRoy gave Clement no instructions on that occasion, and had no knowledge that Clement was using his plane to deliver supplies for Baumann. LeRoy conceded that Baumann had repaired an EKG machine for Dr. Major, and that it was Clement's duty to deliver the apparatus.
Dr. Connie Major testified that sometime after 5:00 P.M. on the date of the accident, Clement called her and stated that the EKG machine had been repaired, and that he would fly it to her that afternoon.
*862 Dr. Major advised Clement she did not necessarily need the machine then because she had another that was working. She also told Clement it had been raining at White Castle, and that she was not sure she could have someone meet the plane at the airstrip. Clement told Dr. Major he liked to fly and would fly down anyway.
In Maas v. Harvey, 200 La. 736, 8 So.2d 683, an employer was sued for damages caused by his employee, Harvey, who ran into the rear of plaintiff's vehicle while operating an employer owned vehicle. The employee, a salesman, was on a purely personal mission at the time. Plaintiff contended the accident occurred within the course and scope of the employment because the possibility of the salesman making a sale was ever present. This contention was rejected by the court which relied upon Fox, above.
In Fox, an employee on a pleasure trip, transacted business with a client whom he met purely by chance. After completion of the business transaction and on the employee's return home, the employee was involved in an accident. The court held that the employee was not acting within the scope and course of his employment.
Graffagnini, above, involved an employee who volunteered to drive an indisposed fellow employee to the latter's home after both employees had finished work for the day. An accident occurred en route to the ill employee's residence. It was found that the employee was not within the course and scope of his employment.
In this instance, Clement's flight to White Castle was more than incidental to any personal mission motive Clement may have had in flying on this particular occasion. Regardless of Clement's general motive for flying on this occasion, it is clear beyond doubt that in flying to White Castle, he was delivering equipment to a Baumann customer, and also that it was Clement's duty to make said delivery. Assuming that Clement's general motive in flying on this occasion was for personal pleasure, there is no question but that in making this particular segment or leg of flight, he was performing a duty which was not only required by his employment, but which also was to the benefit and advantage of his employer. In flying purely for pleasure, Clement could have flown any place. He flew to White Castle for the express purpose of making the delivery. That he used a plane instead of an automobile is of no moment inasmuch as he was not in violation of any instruction in so doing. Under the circumstances, we find the jury properly found that Clement was acting within the scope and during the course of his employment.
We find no prejudicial error in the trial court's refusal to give Baumann's requested special charge that Clement is presumed to have been exercising ordinary care and did not intentionally seek to expose himself to unnecessary risk of harm.
Under the circumstances of this case, we find that had this requested charge been given, it could not reasonably or logically have altered the jury determination that Clement was negligent, and that said negligence was a proximate cause of the accident.

DECREE
It is ordered, adjudged and decreed that the judgment rendered herein in rejecting and dismissing the demands of plaintiff, Margot R. Lea, individually and on behalf of her minor children, Robyn Lea and Reid Lea, against defendant, Louisiana Power and Light Company, be and the same is hereby affirmed.
It is further ordered, adjudged and decreed that the judgment rendered herein in favor of plaintiff against defendant, Newark Insurance Company, be and the same is hereby annulled, reversed and set aside, and judgment rendered herein in favor of Newark Insurance Company dismissing and rejecting plaintiff's claims against said defendant, with prejudice.
*863 It is further ordered, adjudged and decreed that the judgment rendered herein in favor of plaintiff against defendant, Baumann Surgical Supplies, Inc., be and the same is hereby affirmed; all costs of these proceedings to be paid by defendant, Baumann Surgical Supplies, Inc.
Affirmed in part, reversed in part and rendered.